UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
------------------------------X    Docket#
CARL GOODLOE,                  :    12-cv-03018-KAM-VMS
              Plaintiff,       :
                               :
      - versus -               :    U.S. Courthouse
                               :    Brooklyn, New York
                               :
CITY OF NEW YORK, et al.,      :    December 16, 2014
              Defendants.      :
------------------------------X
```

TRANSCRIPT OF CIVIL CAUSE FOR STATUS CONFERENCE
BEFORE THE HONORABLE VERA M. SCANLON
UNITED STATES MAGISTRATE JUDGE

**A P P E A R A N C E S:**

**For the Plaintiff**:      **Harold C. Baker, Esq.**
                            Law Office of Harold C. Baker
                            32 Court Street
                            Suite 507
                            Brooklyn, NY 11201


**For the Defendant**:      **Erica Michelle Haber, Esq.**
                            New York City Law Department
                            100 Church Street
                            New York, NY 10007

**Transcription Service**:  **Transcriptions Plus II, Inc.**
                            740 Sharon Road
                            Copiague, NY  11726
                            laferrara44@gmail.com

Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

Proceedings

1            THE COURT:  All right.  So this is Goodloe v.

2    NYC, 12-cv-3018 and I know you well, but let's just put

3    your appearances on the record.

4            For the plaintiff?

5            MR. BAKER:  Good morning, your Honor.  For the

6    plaintiff, Carl Goodloe, Harold Baker, 32 Court Street,

7    Brooklyn, New York.

8            THE COURT:  Good morning or good afternoon, I

9    guess.

10            And for the City defendants?

11            MS. HABER:  Good afternoon, your Honor.  Erica

12    Haber for the defendants.

13            THE COURT:  Okay.  So I have -- I think the

14    copies I have are from the courtesy copies but some of

15    the docket numbers -- but we have plaintiff's memo,

16    defendants' memo, Ms. Haber's declaration, Mr. Baker, the

17    notice of motion with all of the attachments and then

18    your cover letter of November 13th from Mr. Baker and

19    then the November 10th letter from the City and also, I

20    have the September 5th ex parte letter.  Okay.

21            So I have a couple of questions but let's start

22    with the very big picture which is one, I think, of the

23    City's objections which is relevance.  Why do you need

24    this, which is obviously going to tie right into the

25    question about what's the compelling need that you have

3

Proceedings

1   which would be if you go beyond relevance, then why do

2   you really need this?  Can you jump right in?

3          MR. BAKER:  Thank you, your Honor.  The

4   material that plaintiff sees is relevant to his claim for

5   malicious prosecution regarding the conspiracy charge.

6          THE COURT:  Right.

7          MR. BAKER:  And the way it's relevant, Judge,

8   is that in order to prove malicious prosecution,

9   plaintiff has to show that there was fraud or deceit or

10  perjury at the grand jury and that the police acting with

11  the confidential informant caused false or fraudulent

12  testimony to occur.

13         It's plaintiff's position that the only way

14  that we can prove that is to discover exactly what it was

15  the confidential informant told the police and told the

16  DA and also the circumstances under which that

17  information was relayed.

18         THE COURT:  Uh-hum.

19         MR. BAKER:  A lot of it has to do with whether

20  or not the confidential informant was under pressure, was

21  coerced, was promised leniency.  None of that information

22  has been disclosed.  It's been -- a little bit of

23  information has been disclosed that he did -- that the

24  confidential informant receive monetary compensation and

25  also consideration in a criminal matter.

4

Proceedings

1      My client denies any involvement in the

2 conspiracy whatsoever.  He declares his innocence.  In a

3 nutshell, our position is you can't have your cake and

4 eat it too.  In other words, the defendants claim that

5 there probable cause through the testimony of the

6 confidential informant.  Yet we don't want to disclose

7 the information around that probable cause based on the

8 law enforcement privilege.  So the plaintiff is basically

9 hamstrung in their efforts to prove fraud, deceit,

10 perjury, et cetera, to establish the malicious

11 prosecution claim.  There really is no other information

12 that will suffice or no other discoverable material which

13 will answer these questions and that's the basis of our

14 claim.

15      THE COURT:  Where did the fraud happen in your

16 view?  I mean what happened?

17      MR. BAKER:  All right.  Well, in context with

18 all the other information in the case and that --

19      THE COURT:  Right.

20      MR. BAKER:  --  and what I mean is if you look

21 at the way the other part of the investigation unfolded

22 with respect to the allegations that he sold drugs on a

23 particular date --

24      THE COURT:  Right.

25      MR. BAKER:  -- these identification procedures,

5

Proceedings

1   the testimony about confirmatory I.D.s, all I would

2   suggest to the Court is -- sounds and is incredible.

3   Because of that, they -- our theory is that they needed

4   something else to boost up their case to support the

5   allegations against Mr. Goodloe and they came up with

6   this confidential informant.  I don't know what the

7   confidential informant said to the grand jury but the

8   judge who reviewed the grand jury minutes had his own

9   doubts about the D.A.'s case against Mr. Goodloe and

10  reduced the bail and released him from jail at that time.

11  So there is something there and we just don't know what

12  it is.

13          And I would suggest to the Court that I believe

14  that through discovery and through discovering what the

15  confidential informant said and the circumstances under

16  which it was said, we will be able to establish that

17  there was some fraud, perjury, deceit, with respect to

18  bringing this allegation of conspiracy against Mr.

19  Goodloe.

20          THE COURT:  And you don't have the grand jury

21  minutes yet?

22          MR. BAKER:  I don't have the grand jury minutes

23  of the confidential informant, no.

24          THE COURT:  All right.  But you have the

25  others?

6

Proceedings

1          MR. BAKER:  I have --

2          THE COURT:  All of the others?

3          MR. BAKER:  -- grand jury minutes of the

4    testimony of the arresting officer and the undercover

5    were provided to Mr. Goodloe during the course of the

6    prosecution --

7          THE COURT:  Discovery, right.

8          MR. BAKER:  -- of the indictment.

9          THE COURT:  Is that everybody or do you know if

10   it's everyone who testified besides the CI?

11         MR. BAKER:  I don't know if that was everybody

12   who testified.  I only have what they gave me.

13         THE COURT:  All right.  And why wasn't the CI

14   testimony given over then, for the same reasons?

15         MR. BAKER:  The CI -- yeah, the CI testimony

16   was withheld, I guess --

17         THE COURT:  Okay.

18         MR. BAKER:  -- just prior to trial but that

19   never happened because they dismissed the case.

20         THE COURT:  Right.

21         MR. BAKER:  So he never got that and I've

22   requested that and requested all the other information

23   with respect to the CI.

24         THE COURT:  Right, I saw that.  Where is the

25   fraud itself though?  You're saying like the wrong that

7

                              Proceedings

1    was done to your client was just in testifying at the

2    grand jury falsely, so that there was an indictment or

3    there was some other like -- whatever.

4              MR. BAKER:  The --

5              THE COURT:  Was there other activity around

6    that you think to help the case --

7              MR. BAKER:  As to the --

8              THE COURT:  -- continue so that --

9              MR. BAKER:  Yes.

10             THE COURT:  -- you know, your client --

11             MR. BAKER:  Yes, because --

12             THE COURT:  Okay.

13             MR. BAKER:  Thank you, your Honor.  You're

14   correct in observing that because actually there was

15   information contained in the criminal court complaint

16   that was attested to by the arresting officer that he

17   received information from the CI about Carl Goodloe, and

18   that was in the criminal court complaint which he caused

19   to be initiated against my client.

20             There were also, I believe, based on

21   information and belief, that there were also meetings

22   between the CI and the police, perhaps meetings between

23   the CI and the DA where this information was relayed, the

24   false information was relayed to the police either with

25   the knowledge of the police or with -- let me restate

8

Proceedings

1    that.

2          It is my belief, it is plaintiff's position

3    that the information was provided -- that the police

4    either came up with the information with the CI or the CI

5    falsely implicated my client based on pressure that was

6    put on him or promised or made to him by the police to

7    implicate Mr. Goodloe.

8          So that's where the fraud and the deceit and

9    the perjury come in because the police colluded with the

10   CI, either they forced him to or they basically bribed

11   him to implicate Mr. Goodloe when, in fact, Mr. Goodloe

12   was innocent of any such crime.

13         The CI is the sole source of information that

14   Goodloe participated in the conspiracy.  There is no

15   other evidence at all.  The only evidence comes from that

16   CI and from the police and from the --

17         THE COURT:  Oh, but isn't that the -- I mean,

18   that's sort of the key part of the defendants' argument,

19   right?  It's not solely the CI.  We have the police

20   officers, right?  Because you had -- there's the

21   undercover, right?

22         MR. BAKER:  Right, but they're the very people

23   that I am claiming have presented false evidence.  So I

24   just don't want to take their word for it, your Honor,

25   and the Court should not take their word for it and I

9

                    Proceedings

1    think if you look at the testimony that was provided by

2    the undercover and the arresting officer at the

3    depositions, it's clear that they weren't truthful.  It's

4    clear that they're embellishing.  It's clear that there

5    testimony is not credible with respect to the buy, the

6    I.D., the confirmatory information, the confirmatory

7    I.D. --

8                THE COURT:  Right.

9                MR. BAKER:  -- of my client.  And this was a

10   set up.  And long before we even knew the identity of the

11   police officers from the September '05 arrest --

12               THE COURT:  Right.

13               MR. BAKER:  -- my client was telling me, I

14   think it was the same cops who arrested me in

15   September --

16               THE COURT:  Uh-hum.

17               MR. BAKER:  -- who were doing this to me.  So

18   lo and behold, we find out through discovery that, in

19   fact, some of the same officers that are involved in the

20   conspiracy case were the exact same officers that

21   arrested my client for the September incident that

22   resulted in a dismissal.  He brought a lawsuit and

23   received a money judgment.

24               THE COURT:  But --

25               MS. HABER:  That's not exactly accurate.

                          Proceedings

1           THE COURT:  Hang on.  Hang on.

2           MS. HABER:  Okay.

3           THE COURT:  Isn't the January '06 or there's --

4    this isn't the quicker version of it but isn't the

5    undercover was involved with Bozman (ph.), right?

6    There's buying drugs.  It's plaintiff's apartment.

7    There's a drug buy but no arrest and the defendants'

8    position is because it was this investigation that was

9    going to lead to this thirty-seven person indictment,

10   right?

11          MR. BAKER:  Well, it wasn't the plaintiff's

12   apartment, your Honor.

13          THE COURT:  And then --

14          MR. BAKER:  It was Bozman's apartment.

15          THE COURT:  Was the plaintiff there --

16   allegedly there?

17          MR. BAKER:  According to the --

18          THE COURT:  Right.

19          MR. BAKER:  Yes.

20          THE COURT:  And then later on -- and there's --

21   he's using a different name?  I mean this is the --

22          MR. BAKER:  No, what happened was --

23          THE COURT:  -- version of events?

24          MR. BAKER:  There was no name.  The -- well,

25   according to the undercover on the January 25th

Proceedings

1  incident --

2          THE COURT:  Uh-hum.

3          MR. BAKER:  -- Bozman allegedly introduced the

4  person in the apartment as "Hood."

5          THE COURT:  What does that mean actually?  It's

6  J.D. Hood or something?

7          MR. BAKER:  Well --

8          THE COURT:  What is that?

9          MR. BAKER:  -- I was confused by that

10 because --

11          THE COURT:  I don't under --

12          MR. BAKER:  -- it --

13          THE COURT:  Yeah.

14          MS. HABER:  Your --

15          THE COURT:  Because later on there's this issue

16 about Goodloe being identified as being Goodloe, so what

17 is that?  What's the Hood thing?

18          MR. BAKER:  Well, I think -- what I originally

19 -- when I read the paperwork, I assumed that J.D. Hood

20 was a name that was given to that subject by the

21 undercover, which is normally what happens.  That's how

22 they get the J.D. name.  The undercover designates a

23 person --

24          THE COURT:  So that's just John Doe?

25          MR. BAKER:  John Doe, exactly.

12

                    Proceedings

 1            THE COURT:  Okay.

 2            MR. BAKER:  And John Doe Red Shirt, John Doe

 3   Braids, John Doe Hood.  However, at the deposition -- and

 4   this is the first time -- I mean I have questioned

 5   undercovers hundreds of time with respect to how they

 6   designate names but it's always the same thing, well he

 7   had a red shirt, so I called him J.D. Shirt --

 8            THE COURT:  Right.

 9            MR. BAKER:  -- or he had a hood on, so I called

10   him J.D. Hood.

11            THE COURT:  Uh-hum.

12            MR. BAKER:  In this particular instance, the

13   undercover claimed that he was introduced by Bozman to

14   this person as "Hood."

15            THE COURT:  That's the guy's name?

16            MR. BAKER:  Right.  Although there was no

17   reference to that made in any of the paperwork by the

18   undercover.

19            THE COURT:  Okay.

20            MR. BAKER:  In other words, there was no

21   reference that until the deposition, I believe, there was

22   no claim by the undercover that Bozman introduced the

23   person as Hood, just that the guy's name was Hood.

24            THE COURT:  And then there's an interaction

25   much later in the year, is that right?

13

                              Proceedings

1           MR. BAKER:  Yes.

2           THE COURT:  About drugs.  And it's in that

3    inter -- wait a minute, hang on.  There's another

4    purchase of drugs in November.

5           MR. BAKER:  November 30th of '06, there was an

6    attempt to purchase drugs by the undercover with --

7    Bozman was walking with the undercover through the

8    courtyard and supposedly Goodloe happened to walk by.

9    The person they claim is Goodloe.  J.D. Hood happened to

10   walk by.

11          THE COURT:  Right.

12          MR. BAKER:  They had a very brief interaction.

13          THE COURT:  What does that mean?  This is the

14   time -- this is thing about weight?

15          MR. BAKER:  Yes.

16          THE COURT:  And what does that -- what does

17   weight mean?

18          MR. BAKER:  I guess weight means more than just

19   dimes, more like larger amounts of drugs.

20          THE COURT:  Oh, okay.

21          MR. BAKER:  Anyway, there's this very brief

22   encounter and this is very interesting because the

23   undercover describes that transaction as occurring in the

24   courtyard between the buildings.

25          MR. BAKER:  The arresting officer Cook,

14

Proceedings

1   contradicts the undercover and says, "Well, I saw the

2   whole thing.  I was parked a block away and I saw in the

3   middle of the afternoon, a block away Goodloe meeting

4   with the undercover.

5          That testimony is incredible.  One of them is

6   lying because it didn't happen.  It can't happen both

7   ways.  It can't be in the courtyard and also in the

8   corner of Blake and Logan Avenue as the arresting officer

9   said.

10          So this is why I put all those facts into the

11  affirmation because I wanted your Honor to see my

12  arguments in context because their case against Goodloe

13  is so extremely weak that they needed something else to

14  bring him into the case.  They needed something else to

15  push it over the line and so they come up with the CI.

16  We don't even -- I don't even know if the CI even

17  testified, to be honest with you, Judge.  I don't know

18  because I don't have all the grand jury minutes.  But

19  it's very suspicious to me that later on the CI comes --

20  the CI supposedly comes forward, much later on, to get

21  this information.  That's why the timing is important.

22  When did the CI come up with this information?  When did

23  he come forward with this information?  Was it before or

24  after the I.D.?  It must have been after the I.D. that

25  occurred, the photographic I.D.

15

Proceedings

1            THE COURT:  That's April of the next year?

2            MR. BAKER:  The photograph I.D. was in December

3    of '06.  So you have the sale in January.  Then you have

4    the encounter in November, November 30th.  Then you have

5    a photo array in, I think, December 15th -- December 5th.

6

7            THE COURT:  All right.  I'm sorry.  I have the

8    dates wrong.  Okay.  When is it, December '06?

9            MR. BAKER:  December 5th, '06 you have the

10   photo array and --

11           THE COURT:  Okay.  So just so I have the date,

12   when's the thing with Cook and Goodloe in the car?

13           MR. BAKER:  The thing with the observation of

14   -- that happens on November 30th where undercover

15   allegedly encounters --

16           THE COURT:  This is where Cook -- isn't there

17   an interaction where Cook realizes that Goodloe --

18           MR. BAKER:  Yes, that's --

19           THE COURT:  -- is Goodloe?

20           MR. BAKER:  That's what I am talking about.

21   That's where he --

22           THE COURT:  All right.  I'm sorry, the date --

23   what's the date for that?

24           MR. BAKER:  November 30th of 2006.

25           THE COURT:  Excuse me.

16

                          Proceedings

1    (Pause)

2              THE COURT:  Okay.  I'm sorry.  Just so I --

3    isn't there -- I'm just looking at my notes.  Is there a

4    later photo array --

5              MR. BAKER:  There's --

6              THE COURT:  -- where he realizes who Hood or

7    whatever name Goodloe is using is actually Goodloe?

8              MR. BAKER:  Yes, there's another encounter.  I

9    believe your Honor is referring to the encounter in

10   April --

11             THE COURT:  Okay, that's April.  All right.  So

12   it's -- okay.  So what happens in December '06 then?

13             MR. BAKER:  Okay.  So in December 5th of '06, a

14   photo array is presented to the undercover and he picks

15   out Mr. Goodloe and says, "That guy is J.D. Hood."

16             THE COURT:  Right.  Okay.  I have the dates

17   wrong.

18             MR. BAKER:  One thing I just wanted to mention

19   to your Honor also which is relevant is that the

20   photograph that was used in the photo array, we believe

21   -- and I haven't confirm this because I still haven't

22   received information about the date that photograph was

23   taken, I believe that was the photograph that was taken

24   of Mr. Goodloe following the September '05 arrest that

25   was eventually voided.  That photograph pursuant to CPLR

17

Proceedings

1   160.50 should have been destroyed.

2           THE COURT:  Right.

3           MR. BAKER:  Yet it was used in a photo array

4   put together by Cook.

5           THE COURT:  Okay.  So just so I understand the

6   big picture.  Why are you saying that -- isn't the

7   undercover a key to all of this?  I mean, the undercover

8   is there in January.  The undercover is there in

9   November.  The undercover is the one making the I.D. in

10  December, right?

11          MR. BAKER:  The undercover --

12          THE COURT:  And the Cook is tied to the

13  undercover, right?

14          MR. BAKER:  Correct.

15          THE COURT:  And so --

16          MR. BAKER:  Those --

17          THE COURT:  And is it just that you think

18  there's a problem and if we get this third-party --

19  literally, the third-party, you might be able to shed

20  down on this whole thing?

21          MR. BAKER:  Yes, Judge, but let me focus a

22  little bit more.

23          THE COURT:  Uh-hum.

24          MR. BAKER:  The testimony of the undercover and

25  the AO are relevant to the charge of criminal sale of a

18

Proceedings

1  controlled substance in the third degree.  So just to

2  remind, your Honor, our part of the claim is that he was

3  falsely and wrongly accused of all the crimes that he was

4  charged with in the indictment.  The criminal sale

5  charge, the CI is not -- has nothing to do with --

6          THE COURT:  Uh-hum.

7          MR. BAKER:  -- because he didn't observe any of

8  that -- well, not that I know of.  I mean --

9          THE COURT:  We don't know.

10          MR. BAKER:  -- he may have said that, yeah, I

11  was there --

12          THE COURT:  Right.

13          MR. BAKER:  -- that day and did those -- I

14  don't know.  But based on what I know now, the AO and the

15  UC and those other police officers who involved in both

16  of those sales --

17          THE COURT:  Uh-hum.

18          MR. BAKER:  -- are the key to the charge of

19  criminal sale of a controlled substances in the third

20  degree.  The conspiracy charge is the AO, the CI, and the

21  D.A. because I don't think the undercover has anything

22  to --

23          THE COURT:  Okay.  And just to go back, you

24  were starting to say it earlier and I cut you off, what

25  is it the criminal complaint says, the CI said to the AO?

19

Proceedings

1           MR. BAKER:  Right, in the criminal court

2  complaint, the arresting officer swears that he received

3  information from a CI.

4           THE COURT:  Uh-hum.

5           MR. BAKER:  That Mr. Goodloe participated in

6  this conspiracy or engaged in activity which made out the

7  crime of conspiracy in the first degree.  It's very

8  generic language.  There's not a lot there.

9           THE COURT:  But --

10          MR. BAKER:  But it clearly says it.

11          THE COURT:  -- isn't there no --

12          MS. HABER:  Does he say -- I'm sorry, I don't

13  know if he says, "Informed by a confidential informant or

14  a person known to this apartment."  That could have been

15  the undercover officer.  As far as I know, there's --

16  I'm not sure that's what the criminal court complaint

17  states.

18          MR. BAKER:  I think we --

19          MS. HABER:  There was (indiscernible) --

20          MR. BAKER:  -- I have to find that.

21          MS. HABER:  -- to that.  Because, your Honor,

22  it's my understanding that it was, you know -- the

23  conspiracy charge was determined by the Office of the

24  District Attorney.  They're the ones that determined the

25  charges.

20

Proceedings

1          MR. BAKER:  No, but the --

2          THE COURT:  Yeah, but there was the evidence

3    coming from the --

4          MR. BAKER:  -- the AO swears to it in the

5    complaint.

6          MS. HABER:  But the evidence is the sale.

7          MR. BAKER:  No, but the --

8          MS. HABER:  The evidence is the sale and if you

9    look -- I'm pretty sure if you look at the criminal court

10   complaint, that's what it says.

11         MR. BAKER:  Well, he's charged in the criminal

12   court complaint with conspiracy.  The only evidence of a

13   conspiracy is the CI.  So the --

14         MS. HABER:  Right.

15         THE COURT:  Obviously, that's the key point. Is

16   that right?  That's what I am trying to have a -- I'll

17   get to you.  I just want to understand why you keep -- I

18   mean I heard you in other times we've been here, you've

19   said something along those lines.  Why?  I mean you have

20   him having at least -- here we've gone over a couple of

21   drug related interactions and this whole thing -- I mean,

22   isn't the big picture, the really big picture, there's

23   thirty-seven people indicted for basically a whole drug

24   operation running out of these, what is it Cypress Hills

25   Houses?  I mean --

Proceedings

1          MR. BAKER:  Of which my client was not a part

2    of and --

3          THE COURT:  He can say that but isn't it just

4    that the -- this is a question of whether they -- well,

5    two things.  The question was was there enough probable

6    cause and obviously there was the indictment, so somebody

7    believed there was but -- and I understand, you want to

8    challenge that by finding this CI, but --

9          MR. BAKER:  Well, Judge, the --

10         THE COURT:  -- was the undercover having -- you

11   know, Bozman is involved, right?  I mean, I just don't --

12   fortunately or unfortunately, the -- however one looks at

13   the law, you don't need to have that much involvement in

14   a big situation to be charged -- tagged with conspiracy,

15   so --

16         MR. BAKER:  I understand your Honor's point.

17         THE COURT:  -- I mean --

18         MR. BAKER:  Yes.

19         THE COURT:  Right?

20         MR. BAKER:  I understand what you're saying and

21   I can't say that I necessarily agree with you because

22   here's the thing, that is true --

23         THE COURT:  That was a descriptive statement,

24   that's not a quality -- that's not like a view on good,

25   bad or indifferent --

22

Proceedings

1        MR. BAKER:  However, the --

2        THE COURT:  -- you know, that's what it is.

3        MR. BAKER:  Both Ms. Rios, the D.A., who was

4   assigned to this case and who put this thing together,

5   admitted during her deposition that the sole source of

6   probable cause for the conspiracy was the confidential

7   informant, as did the arresting officer.

8        THE COURT:  How does that make sense?  I mean

9   there's so many -- I can't say -- I don't know the state

10  version, so you tell me if it's different, right, but you

11  need so many pieces to have a conspiracy that -- is the

12  CI really the sole source, especially in light of having

13  this information that we have just gone over that we do

14  know about?  Why would you ignore the undercover or the

15  connection to Bozman or these conversations?  I mean this

16  is a --

17       MR. BAKER:  Well, that's why when the D.A. --

18  the way the D.A. handled the prosecution gave rise to a

19  suspicion on my part and my client's part that there was

20  something else going on behind the scene because if your

21  Honor is correct -- following your Honor's line of

22  thought there, if there was sufficient evidence to

23  prosecute him for conspiracy without the CI, then there

24  was no need for her to dismiss the charge when she came

25  to court and said my CI is cognitively impaired.  I'm

23

Proceedings

1  dismissing the conspiracy charge.

2          I mean clearly that's a strong indication that

3  they have no other -- that they didn't have faith in the

4  other pieces of evidence that they had to sustain that

5  charge.

6          THE COURT:  Well, it doesn't mean that that was

7  necessarily true when this whole thing started or isn't

8  that -- I mean, she wasn't saying I can't go to the grand

9  jury.  She was saying I can't prove -- you know, whatever

10 -- I can't prove beyond a reasonable doubt which is

11 different from the probable cause.  Right?  I mean it's

12 not the same analysis.

13         MR. BAKER:  True but --

14         THE COURT:  So, I mean, plenty of times you

15 lose a witness and you know, you're not -- I mean I don't

16 know what her approach is.  Some people don't want to go

17 to jail -- I mean, don't want to go to trial if they're

18 not going to succeed but that doesn't tell us whether

19 there was enough to have sustained the probable cause

20 here.

21         MR. BAKER:  Well, I couple my view of the

22 evidence as was given to me by the D.A. which is

23 incomplete -- I don't have everything --

24         THE COURT:  Right.

25         MR. BAKER:  -- with my client sitting across

24

Proceedings

1   from me, looking at me in the eyes and telling me, "Mr.

2   Baker, I'm innocent.  I didn't do any of this.  I was not

3   a part of the conspiracy.  I didn't sell drugs at

4   anybody's house.  I wasn't at Bozman's.  I don't know

5   Bozman.  I wasn't at Bozman's house.  I wasn't there.  I

6   didn't do it."  And that testimony to me is persuasive.

7   You know, I take him at his word.

8          You know, he maintained his innocence since day

9   one.  He's claimed that he's been framed.  It certainly

10  looks -- the way that the evidence got put together is --

11          THE COURT:  All right.

12          MR. BAKER:  -- you know, wouldn't stand up in a

13  court of law.  This is why they dismissed the case.

14          THE COURT:  Okay.  But that's not a malicious

15  prosecution --

16          MR. BAKER:  I know.  That's what I am trying to

17  find out, what the probable cause was because in order

18  for my client --

19          THE COURT:  All right.

20          MR. BAKER:  -- to prove his matter here in this

21  court, he's got to know what the probable cause was,

22  everything.

23          THE COURT:  All right.

24          MR. BAKER:  He can't just know some of it, he's

25  got to know the whole thing.

Proceedings

1    THE COURT:  Look, a couple of questions.  Do

2  you need to know everything about the CI?  Are there some

3  parts of it that's more important to you than other?

4  What's the --

5    MR. BAKER:  Yes, I delineate it in my papers --

6    THE COURT:  -- comments --

7    MR. BAKER:  -- what I believe would help us --

8    THE COURT:  Which seemed to me you want

9  everything.  I don't blame you for asking but, you know,

10  I just want to know if there are things that you think

11  are more important.

12    MR. BAKER:  I think -- yes, I think without

13  knowing the identity and address of the CI, I can dispose

14  of that.  If I get information about the substance of any

15  statements provided by the CA -- CI, sorry, to the

16  defendants and A.D.A. Rios regarding plaintiff, the dates

17  on which the CI provided any such information, how it was

18  he came to provide the information.  Was he in custody?

19  How did they get to this guy?  Did he just come in off

20  the street and say I got information on Goodloe?  How did

21  that information get developed?  What consideration the

22  CI received and how -- was he promised anything before he

23  gave the statement?  I think we need to have the grand

24  jury minutes and any Rosario with respect to that.

25    And, you know, as I've said in my papers, you

26

Proceedings

1  know, the law is clear that a court may deem information

2  inaccessible to the plaintiff personally.

3            THE COURT:  Uh-hum.

4            MR. BAKER:  We can do it on an attorney's eyes

5  only basis.

6            THE COURT:  Okay.  This is an aside but is that

7  really practical here, I mean given the history of your

8  experience with your client in this case which is, you

9  know, you made a motion to withdraw and there was very

10  problematic -- I'm raising it as a practical concern.

11  You know, you have a challenging case --

12            MR. BAKER:  Judge?

13            THE COURT:  -- and a challenging client, you

14  know?

15            MR. BAKER:  The motion to withdraw was nothing

16  more than I had to -- I have an obligation to my client.

17  I have a responsibility as an attorney to -- I took an

18  oath and anything that I put before this Court was based

19  on the facts I had at the time.  It was not a personal

20  issue with the defendant -- with the plaintiff.

21            THE COURT:  No, it's not personal but, you

22  know, given -- if you were to have -- I mean, this is

23  really just practical.  If you're going to have

24  information that your client doesn't have, what's going

25  to happen here?  I mean --

27

                    Proceedings
 1           MR. BAKER:  Well, I've got to prosecute --

 2           THE COURT:  -- maybe we can cross that bridge

 3   when we get there but --

 4           MR. BAKER:  You know, your Honor ruled on my

 5   motion to withdraw and I accept the ruling, my client

 6   accepts the ruling.  We proceeded, you know.

 7           THE COURT:  Okay.

 8           MR. BAKER:  We put our motion in.  You know, I

 9   intend to prosecute the case to the best of my ability

10   regardless of whatever's happened in the past.

11           THE COURT:  All right.

12           MR. BAKER:  You know, if it has to be done, it

13   has to be done.

14           THE COURT:  Let me jump ahead.  If you just

15   accept for the sake of argument, the CI is absolutely

16   cognitively impaired, you cannot oppose the person, then

17   you think the record information that you just talked

18   about, which would -- you know, so you wouldn't be able

19   to say did they lie to you, how did you feel, were you

20   under pressure?  You think that the documents that you

21   just went over still would be helpful to you?

22           MR. BAKER:  Yes, and I think that in the event

23   that it -- you know, he's cognitively impaired to that

24   extent, then perhaps there's other people who have

25   information that are close to him who I may want to talk

28

Proceedings

1   to, you know, with his family members, his mother, his --

2   I don't know, somebody else who may have been present.  I

3   don't know if there was anybody else present with him or

4   anybody whose got any relevant knowledge of the

5   information he gave or under what circumstances he gave

6   the information.

7            THE COURT:  Yeah, but so far we haven't talked

8   about that in this case.  You know, can you -- I mean can

9   you get peripheral information?  I mean, obviously A.D.A.

10  Rios gave you some that wouldn't identify the CI -- or

11  what if -- okay, so this all moving -- I mean, you could

12  say attorney's eyes only and that would be for now but

13  obviously, the point of this is for you to prove your

14  case, and so there's probably going to be a summary

15  judgment motion in this case, maybe you could agree that

16  you filed it under seal and the district judge would be

17  okay with that but eventually you get to trial.  So this

18  is really revealing, the CI's information, right?  That's

19  what this is about.

20           MR. BAKER:  Yes.

21           THE COURT:  I mean we could have some temporary

22  hold but the CI --

23           MR. BAKER:  Right.

24           THE COURT:  Okay.  So what's your response if

25  the defendants really put information out that this is

29

Proceedings

1   going to endanger the CI?  That this is just -- and I

2   mean, just even if you step back, and say look, this was

3   a thirty-seven person indictment, so obviously it's not

4   just, you know, Mr. Goodloe who could give me all kinds

5   of assurances that I am not -- you know, I don't harbor,

6   you know, any vindictiveness or any whatever it would be

7   that one would feel about a CI.  There's thirty-six other

8   people who might be -- I don't know what happened in the

9   case but on the -- just for the hypothetical, people are

10  -- some were convicted, so people cannot be happy with

11  the CI.  So, you know, revealing somebody who is a CI --

12  well, I don't know whether the CI's information was

13  relevant to the whole thing or just maybe to Mr. -- I

14  don't know but, you know, it's one investigation.  The CI

15  is involved.  Thirty-seven people are indicted.  So it's

16  a big case.  Serious allegations.

17          And one might suspect that that would put the

18  person who now is cognitively impaired at --

19          MR. BAKER:  Well --

20          THE COURT:  -- serious risk of harm.  So I mean

21  what are we doing in this case?

22          MR. BAKER:  Well --

23          THE COURT:  I mean forget about the relevance?

24  I'm just saying, you know, that's -- to the extent this

25  is weighing, how do you look at what you have to show

30

                            Proceedings
1   versus putting somebody's life at risk?
2               MR. BAKER:  Well, my client's life was put at
3   risk.  My client's freedom was --
4               THE COURT:  But he's looking for money for, you
5   know, something that happened in the past versus somebody
6   else's safety.  I mean, let's put it starkly --
7               MR. BAKER:  That's true, Judge.
8               THE COURT:  -- because it is that kind of
9   situation.
10              MR. BAKER:  Yes, it is --
11              THE COURT:  I mean for this argument, it is
12   that kind of situation, so what do you do?  What do you
13   think?
14              MR. BAKER:  Well, I don't know what the -- I
15   think that -- I would argue that my client's right to
16   bring his suit and prove his case outweighs the concerns
17   of the defendants.  I think that there can be steps taken
18   to protect him.  The D.A.'s got all kinds of resources
19   and the City has all kinds of resources.  They use people
20   for this type of thing, knowing full-well that they could
21   be in danger.  They could provide him with transport --
22   transfer him somewhere, give him a new identity.
23              THE COURT:  Okay.  But what if the person is --
24   right.  So I mean look --
25              MR. BAKER:  I mean --

31

Proceedings

1    THE COURT:  -- you know, on the one hand, the

2  CI's identity was going to be revealed had this case gone

3  to trial.  So that was a trajectory.

4    MR. BAKER:  Yes.

5    THE COURT:  But -- at least from the version of

6  events that you said with regard to the case being

7  dismissed, in the interim of the criminal case, something

8  changed with the CI.  So the person is, you know, no

9  longer whatever -- they now -- he or she now has this

10 problem.  So whatever -- I mean, what WITSEC --

11   MR. BAKER:  Well, Judge, I'll say this --

12   THE COURT:  -- or whatever you're proposing may

13 not be something -- I mean, I don't know if it would ever

14 be practical for something that's being revealed in a

15 civil case but take it that this person's situation, you

16 know, is much, much worse.  Not somebody who can go and

17 start a new life, right?  I mean the City's position has

18 been the person is cognitively impaired and you know from

19 the criminal case that that was something that the D.A.

20 raised.

21     So if you take it that that was in code for

22 we're having a problem, and it's actually a description

23 of the situation, then what do you do?

24   MR. BAKER:  Well, I would --

25   THE COURT:  How do you weigh -- how do you

32

Proceedings

1  think I should be weighing the considerations?  There is

2  no simple, you know, give him money to start a new life

3  kind of thing, like this is the fallout, because he --

4  you know, he or she, I don't know what it is, went off --

5  you know, didn't go off into WITSEC or whatever the state

6  version is.

7           MR. BAKER:  Okay.  Well, there are

8  circumstances under which CI's identities are revealed in

9  the criminal context.  I know there's a difference

10  between somebody's liberty is at stake there, whereas

11  here, Mr. Goodloe is seeking money.  But there are steps

12  that could be taken similar to the steps that are taken

13  in that scenario.

14           The fact that the person is cognitively

15  impaired, you know, is a factor that will come into play

16  but it doesn't change the fact that there could be steps

17  taken to protect that person.  I'm not sure if that

18  particular CI provided information against anybody other

19  than Carl Goodloe.

20           THE COURT:  I know.  You and I, we know what we

21  know.  I don't know if the City really knows much more

22  than we know.

23           MR. BAKER:  But I think that there are steps

24  short of revealing the identity that may help the

25  plaintiff to get closer to proving their case and maybe

33

Proceedings

1   put a little bit more pressure on the City to settle the

2   manner in a fair way.

3           THE COURT:  Okay.  What happens at trial?  So

4   say you're entitled to this information but because of

5   this privilege and these concerns, you can't get that

6   information, do you get anything at trial and I have not

7   looked at this, so I have no idea, so this is really a

8   question to the floor --

9           MR. BAKER:  Well, if the --

10          THE COURT:  -- do you get a missing witness

11  charge?  Do you get anything?

12          MR. BAKER:  Yeah, I think so.

13          THE COURT:  Yeah.  So, right.

14          MR. BAKER:  I think the fact that this goes --

15          THE COURT:  I mean, what would you ask for?

16  What do you want at trial?  Obviously, I'm not the trial

17  judge but I'm just seeing where this whole thing goes.

18          MR. BAKER:  I would want --

19          THE COURT:  Because you're going back to the

20  point that this is a compelling need question.

21          MR. BAKER:  Right.  I would ask for an adverse

22  inference against the City that if this witness had been

23  called, that he would have given testimony that would

24  undermine their position and it would support the

25  plaintiff.

34

Proceedings

1          THE COURT:  Right.  All right.

2          MR. BAKER:  You know, they -- we have to prove

3    our case and we're hamstrung in our ability to do that by

4    the withholding of the information and by the fact that

5    this witness became cognitively impaired, I mean

6    that's -- I have empathy for that person as a human being

7    but that's the person that put my client in jail and

8    deprived him of his liberty and that's the person that we

9    believe colluded --

10         THE COURT:  Well, we don't know but that's

11   possible.

12         MR. BAKER:  Right.

13         THE COURT:  Well, we don't know.  I mean --

14         MR. BAKER:  What I do know is that my client is

15   asserting his innocence and he'll say in open -- he'll

16   get up and testify at trial, I'm innocent.  These people

17   framed me.  So then it's on them.  Come forward with the

18   evidence that my client's guilty of conspiracy.  If they

19   can't do it, they lose.

20         THE COURT:  All right.  So the problem -- well,

21   the thing we don't know here and I still don't really

22   understand, is the confidential informant's testimony

23   really relevant -- not relevant, it is relevant but is it

24   necessary and was it key to the conspiracy because there

25   are just -- well, even in the brief description we've

35

Proceedings

1  gone over, allegedly, according to the undercover,

2  multiple interactions with the plaintiff and so why is

3  that not enough -- at least a couple of interactions and

4  related to drugs.  And given the overall idea that the

5  sale -- which seems to be anyway, that the sale of drugs

6  at this housing project was part of the -- a big sales

7  operation and that's what all these folks were indicted

8  for, then the fact that their allegations that Mr.

9  Goodloe was involved in that, isn't that enough to bring

10  him in at least in good faith, into the -- well, whatever

11  -- good faith is not a standard.

12            MR. BAKER:  No.

13            THE COURT:  There was reason to believe that he

14  was part of the conspiracy and then, you know, this was

15  -- this whole operation seems like -- I don't know

16  actually, I shouldn't say that -- I don't know what

17  happened at the grand jury.

18            MR. BAKER:  Judge, my answer to that question

19  is --

20            THE COURT:  Go ahead.

21            MR. BAKER:  -- a resounding no.

22            THE COURT:  Why?

23            MR. BAKER:  And that's why I put all of that

24  information in the affirmation because if you look

25  closely at it, it's a house of cards.  There's no way --

36

Proceedings

1   this is what they theorize.  The undercover officer

2   claims  that he accurately and reliably identifies my

3   client, eleven months after he makes a purchase or ten

4   months after he makes a purchase, when he couldn't I.D.

5   my client minutes after watching the sale in September of

6   '05 backing up the other undercover, okay?

7           THE COURT:  So that -- all right.

8           MR. BAKER:  And then in January, January 26th,

9   he --

10          THE COURT:  That (indiscernible) seem so crazy,

11  go ahead.

12          MR. BAKER:  -- allegedly buys drugs from the

13  same person and doesn't recognize him as the person who

14  sold drugs in September.  And now in between January of

15  '06, the sale --

16          THE COURT:  Uh-hum.

17          MR. BAKER:  -- and the November 30th

18  interaction, he's done hundreds of sales with hundreds of

19  different people, a lot of whom look exactly like my

20  client.

21          THE COURT:  Do we know it's hundreds of people?

22          MR. BAKER:  Well, maybe not hundreds.  Let's

23  say thirty.

24          THE COURT:  And multiple sales or multiple

25  people?

Proceedings

1          MR. BAKER:  Multiple sales, multiple people,

2    multiple sales on the same day.

3          THE COURT:  But we don't -- I mean, we don't

4    actually know how many repeat players there were, that's

5    the --

6          MR. BAKER:  No, we don't even know -- the

7    undercover testified --

8          THE COURT:  I mean your point is nobody can

9    remember this and that's sort of a fundamental part of

10   your argument.  I'm like, I don't -- it doesn't -- I'm

11   not somebody with an incredible memory but I know plenty

12   of people who have very good memories and they meet

13   somebody and they remember them.  You're alleging it's

14   implausible and I don't know that it is.

15         MR. BAKER:  I think that's for the jury to

16   decide, Judge.

17         THE COURT:  Well, but you're saying you're

18   compelling -- a compelling need because the testimony is

19   so suspect.

20         MR. BAKER:  Well, that's the reason because

21   your Honor asked me about that isn't there other

22   evidence --

23         THE COURT:  Yeah.  No, I understand your

24   argument.  I just don't know how much I - how convincing

25   it is.

38

Proceedings

1          MR. BAKER:  So the other evidence of the

2     conspiracy --

3          THE COURT:  All right.

4          MR. BAKER:  -- then is the undercover's

5     testimony which is incredible and officer -- arresting

6     officer Cooke's testimony which is incredible.  Nobody is

7     going to believe that this guy sat a block away -- if you

8     look out the window and look a block down the street --

9          THE COURT:  Right.

10          MR. BAKER:  -- and you look at somebody walk by

11     for like half a minute, he's going to try to convince you

12     that he recognized Carl Goodloe through all that traffic,

13     trees, wires, telephone poles --

14          THE COURT:  Right.

15          MR. BAKER:  -- from the backseat of a car for

16     like a minute when the transaction, according to the

17     undercover, occurred behind walls of the building.

18          THE COURT:  Right.

19          MR. BAKER:  It's incredible.  It's absolutely

20     incredible.  I submit it's a lie.

21          THE COURT:  Uh-hum.

22          MR. BAKER:  These officers are lying about it.

23          THE COURT:  All right.  So Ms. Haber might die

24     of frustration over there.  Yes, ma'am?

25          MS. HABER:  No, I just want to make clear that

39

Proceedings

1   the undercover was not involved with the buy in

2   September.  He didn't see Carl Goodloe.  There's no

3   mention of him in the buy report because he didn't

4   observe him.  That's why he couldn't identify him.

5          The second part is I mean as your Honor is

6   aware, it's our position that this is totally irrelevant

7   to the probable cause analysis.  All of this information

8   about, you know, or this opinion of plaintiff being

9   innocent is just merely that.  It's just pure

10  speculation.  The evidence shows right now that he was --

11  the undercover bought crack cocaine from a person he

12  identified as Carl Goodloe and just so the --

13          THE COURT:  Which sale are we talking about?

14  You're talking --

15          MS. HABER:  The original one in January 2006.

16          THE COURT:  Okay.

17          MS. HABER:  That's what this case is about, is

18  he bought under -- he bought crack cocaine from Carl

19  Goodloe in Larry Bozman's apartment on January 25th,

20  2006.

21          THE COURT:  And at the time, he's identified as

22  Hood, right?

23          MS. HABER:  Correct.

24          THE COURT:  Uh-hum.

25          MS. HABER:  Correct.  Because the undercover

40

Proceedings

1   didn't know who he was.  He identified him as J.D. Hood.

2          Then later on in November of 2006, they're

3   walking in the -- within the housing project and he runs

4   into the individual that the undercover knows as J.D.

5   Hood, and he says to Cooke, "Yeah, that was J.D. Hood."

6   Cooke knew him as Carl Goodloe because Detective Cooke

7   had done a prior investigation called The Narcotics Plan

8   in which he was involved with investigating narcotics in

9   the vicinity of the 75th Precinct.  This is what he

10  testified to at the deposition.  He knew Carl Goodloe.

11  Carl Goodloe was popular in the area.  Carl Goodloe

12  testified at his deposition that he stayed in the Cypress

13  Hill Houses four to five nights a week during this time

14  period.  He was there all the time.  Detective Cooke knew

15  who he was.

16          He had also been arrested like a total of

17  twenty-seven times.  I can't remember how many times

18  before -- I think it's in my papers somewhere -- he was

19  arrested in the 75th Precinct at least seven times before

20  the January incident or before the November incident and

21  Detective Cooke, before he was assigned to narcotics

22  worked in the 7-5 Precinct.  Detective Cooke knew who

23  this guy was.

24          THE COURT:  Okay.  So what's your -- one or two

25  question to start out with.

41

Proceedings

1          MS. HABER:  Sure.

2          THE COURT:  What's your view of how there's

3    enough information here to tie him to the conspiracy

4    without the CI?

5          MS. HABER:  My information is purely that, your

6    Honor, what you were discussing with Mr. Baker, which

7    would be the sale and the related drug transactions.  And

8    the fact that he was -- Larry Bozman was a target of the

9    conspiracy investigation and Larry Bozman introduced the

10   undercover to plaintiff.  That's enough on its own to

11   establish the conspiracy and the law says that a

12   conspirator is guilty of the first degree offense of

13   conspiracy, if he's not only unaware of the age of the

14   young conspirator but does not even know of that

15   individual's existence.

16          THE COURT:  Right.

17          MS. HABER:  So I mean I think it was exactly

18   what your Honor was saying that they had the sale.  They

19   had the contact with him.  They knew he was engaged in

20   this narcotics related transaction.  I mean, I would

21   argue it was a sale in Larry Bozman's apartment.

22          THE COURT:  Right, (indiscernible).

23          MS. HABER:  And then just so the Court is

24   aware, it's my understanding the CI provided historical

25   testimony -- that's what they call historical testimony

42

Proceedings

1   where he or she explain the layout of the building, of

2   the complex, that kind of stuff and A.D.A. Rios testified

3   that the CI identified Carl Goodloe as a worker in this

4   drug hierarchy that existed at Cypress Hills.  And she

5   testified that was what it was.

6          And my understanding is also that most of the

7   information obtained from the CI was obtained during

8   interviews with the A.D.A. and Detective Cooke.  It was

9   all interviews and so --

10         THE COURT:  What does that mean?

11         MS. HABER:  They got the information -- I don't

12  know that there's even any paperwork that we would turn

13  over, other than the grand jury minutes which I can't

14  turn over.  He has to make an application to the state

15  court which hasn't been done.  I mean, we don't have

16  possession.  The City of New York does not have

17  possession of the grand jury minutes.  The state court

18  has that.  So that's nothing that we could turn over.

19         MR. BAKER:  I'll have to do an unsealing order,

20  I guess.

21         MS. HABER:  But also --

22         THE COURT:  Hang on.

23         MS. HABER:  -- Rehberg --

24         THE COURT:  Okay, just hold that thought for

25  one second.

43

Proceedings

1        MS. HABER:  Sure.

2        THE COURT:  All right.  So you're -- I'm just

3   thinking about what you're agreeing.  Your view is that

4   there's enough here -- okay.  So this is -- just put

5   Rehberg aside but this idea -- like from your perspective

6   with regard to the malicious prosecution claim, what is

7   it -- plaintiff's view is basically if I can challenge

8   what's being said in part by the CI's -- evidence about

9   the CI, then I could show that the officers were lying

10  and that they lied before the grand jury, they lied to

11  the grand jury, they lied after the grand jury and that's

12  why Mr. Goodloe was in prison or in jail for so long.

13        And you make the argument -- and we don't even

14  know what the CI -- we don't care what the CI said, I

15  have enough information to show there was probable cause

16  but that is if you accept what the officers are saying

17  and plaintiff doesn't.

18        So how are we supposed to look at your point

19  that there's enough probable cause and I'm was talking to

20  Ryan, the law clerk, yesterday.  I'm like what's the

21  model that you use, right?  Because -- and the only one

22  that I could think of which seems to fit what you're

23  describing is when you're testing a search warrant and

24  there's a challenge to the warrant and something is found

25  to be whatever, wrong or improper, unless there's a real

44

Proceedings

1  scandal related to it, what you do is cross-out

2  everything that's questionable and you look at it and you

3  say is there enough here to justify the warrant.  And if

4  the warrant still -- you know, if that information's

5  enough to have probable cause to do the search, your

6  warrant is fine.  It doesn't matter that there are all

7  those other problems.

8          So I mean it seems like that's along the lines

9  of what you're saying.  You're saying you don't care what

10  the CI said.  We know these facts here that Cooke and the

11  undercover knew about the Bozman-Goodloe interaction and

12  that's enough to have probable cause and I don't have to

13  ever look at the other and it doesn't matter if at some

14  point along the way, somebody might have believed, you

15  know, either the CI was saying something contradictory or

16  -- which I don't know if that seems that likely, or

17  collectively I could show lots of inconsistencies between

18  the undercover and the CI or -- I put them all up there,

19  and nobody -- you know, basically the jury believes Mr.

20  Goodloe and thinks the officers are, you know, not

21  telling the truth but whatever, that's -- I mean that's

22  another possibility.

23          But I'm like what framework are we supposed to

24  look at this to make the evaluation about whether for

25  proving malicious prosecution the plaintiff needs the

45

Proceedings

1   CI's testimony?  Or, you know, even that it would -- I

2   mean your argument is first tier, not relevant.  Second

3   tier, doesn't meet compelling need or even -- okay, but

4   so --

5           MS. HABER:  Right.

6           THE COURT:  You know --

7           MS. HABER:  I mean that's --

8           THE COURT:  -- how do we frame it?

9           MS. HABER:  Well, I think the main, larger

10  frame would be that the indictment creates a presumption

11  of probable cause.

12          THE COURT:  It's a rebuttable presumption.  So

13  he wants to --

14          MS. HABER:  It's a rebuttable, right.

15          THE COURT:  -- rebut.

16          MS. HABER:  Right.  And he has -- I would argue

17  that he has enough information through other sources,

18  i.e, A.D.A. Rios and Detective Cooke to try to rebut that

19  presumption.  They have testified basically what the CI

20  -- what they learned from the CI.

21          THE COURT:  Okay.  But see that's not saying

22  though it's not relevant.  That's saying it doesn't meet

23  the compelling need test.  Basically, you should not

24  endanger the CI because they have enough.  Your

25  preliminary argument is --

46

Proceedings

1          MS. HABER:  Well --

2          THE COURT:  -- nothing, it's a lot of noise

3   about nothing.

4          MS. HABER:  Right.  And my preliminary

5   argument, there's independent probable cause to charge

6   conspiracy aside from what the CI set.

7          THE COURT:  And I guess my question is what

8   does independent really mean when you're looking at it?

9   Is it -- is there some presumption that I say okay, these

10  witnesses are credible or I'm supposed to assume that

11  they're credible or, you know, kind of what I said about

12  the -- we assume they're credible and we -- you know,

13  like the way you do a search warrant, cross-out

14  everything that you don't need and that's how you look at

15  it or, you know, or not --

16         MS. HABER:  And --

17         THE COURT:  I mean, his --

18         MS. HABER:  -- I don't think this is a

19  credibility determination at this point and I think all

20  of these facts contained the plaintiff's affirmation or

21  Mr. Baker's affirmation missed the whole point of the

22  relevance --

23         THE COURT:  Okay.

24         MS. HABER:  I just -- this is not --

25         THE COURT:  Tell me what it is because I'm not

47

Proceedings

1   sure I get it or at least --

2           MS. HABER:  I think because of the fact of a

3   sale with the co-conspirator is enough to establish the

4   probable cause of a conspiracy.  And then in order to --

5   and I know he's disputing that that happened but a grand

6   jury believed that it happened and we have the

7   indictment.  So at this point --

8           THE COURT:  Well, we don't know that.  Right?

9   We have two things; one, we don't know if the CI

10  testified -- right?  I mean --

11          MS. HABER:  Well, we don't know about the CI

12  but we know that the undercover and Detective Cooke

13  testified at the grand jury and they --

14          THE COURT:  But you're saying it's enough,

15  right?

16          MS. HABER:  Yes, to establish the probable

17  cause to prosecute.

18          THE COURT:  Uh-hum.

19          MS. HABER:  And there's also no intervening

20  fact that vitiated the probable cause from the date of

21  the arraignment --

22          THE COURT:  Right, right.

23          MS. HABER:  -- until the date the charges were

24  dismissed, as far as I know.

25          MR. BAKER:  Well, there's a not guilty plea.

48

Proceedings

1           MS. HABER:  But that doesn't vitiate probable

2    cause.

3           MR. BAKER:  Well, you know, if this is --

4    probable cause doesn't exist if it's a lie and I would

5    compare this to a situation where you have --

6           THE COURT:  Well, now we're getting into

7    Rehberg but go ahead.

8           MR. BAKER:  -- you have, for example, a

9    statement that's obtained unlawfully.  If that's what

10   probable cause is based on, that statement gets

11   suppressed.  You don't have probable cause, it doesn't

12   exist.

13          THE COURT:  Well, that's basically the search

14   warrant comparison.

15          MR. BAKER:  And the same thing here with the

16   identification.

17          THE COURT:  Right.

18          MR. BAKER:  If that had gone to a hearing --

19          THE COURT:  He's saying it's a lie and --

20          MS. HABER:  But there's no evidence right now

21   that it's a lie.

22          THE COURT:  Well, okay, but take it -- put

23   aside that Mr. Goodloe is saying, what about the --

24   basically I think where Mr. Baker is going with it is if

25   I could show you a physical picture of the layout of this

49

Proceedings

1   courtyard/street, it would show that Officer Cooke's

2   statement is absolutely impossible.  It does not -- it's

3   physically an impossibility, right?  And so that would

4   undermine what Cooke said.

5           MS. HABER:  At which point then maybe the sale

6   of cocaine on January 25th, 2006 would be in question and

7   then maybe he could establish that they're lying and then

8   there would be no probable cause for the conspiracy.  You

9   know, if we follow that road, then he's made his case and

10  the CI has nothing to do with it still.

11          THE COURT:  I know, but that's --

12          MS. HABER:  I mean --

13          THE COURT:  But that goes to compelling need.

14  That doesn't go to relevance.  I have a very basic

15  question which is you say there's enough probable cause

16  and what does that mean?  Does that mean you say there

17  was -- it's just a prima facie sort of like as if it were

18  a pleading, right?  We've said enough to the grand jury.

19  I mean, this may be a very basic question why it doesn't

20  seem to have a -- we've said enough to the grand jury.

21  We have offered information about every point of a

22  conspiracy, you know, that there was an overt act, that

23  there was an agreement, you know, and all the different

24  factors or elements and that's it.  That's all we had to

25  do and obviously the grand jury believes it because they

50

Proceedings

1   indict him.  And there's nothing else.  Nothing else is

2   relevant.

3            MS. HABER:  And well, I mean --

4            THE COURT:  And no other information is needed

5   and --

6            MS. HABER:  And --

7            THE COURT:  -- then the question bounces back

8   to Mr. Baker is like they're all liars, basically.

9   That's sort of the bottom line here.  That's what his

10  position is because he's saying if his client -- you

11  know, they have to be lying because they're saying things

12  and his client, if you take his client's position is he

13  has nothing to do with this.  So it's not even like a

14  question of well, I viewed it this way.  It's like I

15  wasn't there.  I didn't sell drugs.  I didn't do any of

16  these things, right?

17           So if they're all lying, what do you have?  I

18  mean it's got to be -- how do you rebut the presumption,

19  is I guess the question, right?  Not in this particular

20  case.  What does it mean to rebut a presumption if you've

21  offered evidence that hit on every point of the charge?

22           MS. HABER:  I mean I think by attacking

23  credibility.  I mean, or showing some piece of evidence

24  that the -- for example, the cops planted evidence.

25           THE COURT:  Right.

51

Proceedings

1          MS. HABER:  They put crack cocaine in the

2   plaintiff's pocket and there's some --

3          THE COURT:  All right.

4          MS. HABER:  -- witness that said that they did

5   that.

6          THE COURT:  Okay.

7          MS. HABER:  That might rebut the presumption of

8   probable cause.

9          THE COURT:  All right.  So --

10         MS. HABER:  There's nothing like that here,

11  your Honor.  There's nothing like that here.

12         MR. BAKER:  Well, first of all, the D.A. chose

13  to put the CI in the grand jury and elicit testimony

14  about my client.  If they didn't need to do that, then

15  they shouldn't have done it but they did.

16         THE COURT:  Uh-hum.

17         MR. BAKER:  And they're telling me at their

18  depositions that we based -- the probable cause for the

19  conspiracy was based on the CI.  They didn't mention

20  anything about the interaction with Bozman.  So they're

21  telling me under oath that was what they based their

22  assessment on.

23         THE COURT:  That's what you're saying how you

24  read Rios' statement?

25         MR. BAKER:  Yes.  So there is a compelling

52

Proceedings

1   need.  We need to know what that -- and here's another

2   thing.  We need to know, for example, how did the CI even

3   get into the D.A.'s Office?  Did Cooke bring him in?  Did

4   Cooke make the arrest of the CI?  Did Cooke go look for

5   the CI and find the CI and bring him in for this purpose?

6   How did he come to be talking to the D.A. about Carl

7   Goodloe?

8          These are all questions that they refused to

9   answer and I think it's highly relevant to determine

10  whether or not there was perjury and deceit and fraud, et

11  cetera, that caused my client to be indicted and to rebut

12  the presumption, we need that information.

13          THE COURT:  All right.  Other thoughts about

14  what it means to be able to rebut as presumption or -- I

15  mean, you've said over and over again in your papers and

16  in here, you've had enough information and we can ignore

17  the CI.  It's just not -- you don't have to factor it in.

18  And my question is, why is that argument correct?

19          MS. HABER:  Well, I just think because it goes

20  back to the independent probable cause question where

21  based on just the sale, which is from this point

22  undisputed.  Unfortunately, Larry Bozman is deceased.

23  You know, he probably would have been a good witness in

24  this case but based on the evidence that we have to date,

25  there's an independent probable cause that supports the

53

Proceedings

1    indictment.  That's the argument.

2         And assuming arguendo, it is relevant --

3    assuming arguendo, it is relevant to prove the fraud and

4    the perjury, the law enforcement and informer's privilege

5    applies and there has not been a showing of compelling

6    need in this case, based on the fact that there is the

7    independent probable cause.

8         THE COURT:  Yes, but that's not circular.

9         MS. HABER:  But at the same time, there's such

10   a slippery slope.  If we start allowing plaintiffs to,

11   you know, to identify, depose, produce for trial,

12   confidential informant, law enforcement --

13        THE COURT:  Look, to be clear, I think this is

14   a huge problem.  That's why I have had you here an hour.

15   I think that this -- I agree.  I mean whatever one's view

16   of whether CI's is a good way to go or not, the fact is

17   that there was a CI in this case.  If they had followed

18   standard practice, this person was promised relative, you

19   know, confidentiality and then the information provided

20   to me is that this person is actually cognitively

21   impaired.  It's not a code, it's a problem.

22        And so I'm very concerned about this person's

23   safety if his -- his or her, I don't know -- information

24   is revealed.  And so compelling has to be compelling and,

25   you know, where are we with this?  So let's see.

54

Proceedings

1          From the City's view, what do you think happens

2     at trial if this information is not produced?  I mean

3     this person's --

4               MS. HABER:  I mean I --

5               THE COURT:  -- a witness, I mean, maybe unavail

6     -- I mean this might be one of those, you know, actually

7     unavailable kinds of things.  I don't know, you know, but

8     -- I don't know what posture --

9               MS. HABER:  I mean I think --

10              THE COURT:  -- does it put this case in?

11              MS. HABER:  I mean, I think we would move for a

12    protective order again at trial.

13              THE COURT:  Yeah, yeah, yeah.  I'm talking

14    about the question about the instruction to the jury

15    about the fact that the person who would have information

16    is not here.

17              MS. HABER:  Oh, then I would argue that it

18    would be an unavailability, not an adverse inference.

19    You know, there's a difference --

20              THE COURT:  Because of being a CI or because of

21    the cognitive impairment?

22              MS. HABER:  Both.

23              THE COURT:  All right.  But then the records

24    available --

25              MS. HABER:  Both.

55

Proceedings

1          THE COURT:  -- about the person that would not

2   be -- you know, that probably some of the records are

3   kept in the regular course of business.

4          MS. HABER:  I mean --

5          THE COURT:  And you're not giving any

6   information about the person, so --

7          MS. HABER:  I mean, I think everything he's

8   asking for in terms of relevance like the -- you know,

9   the person's name, the person's address.  None of that is

10  relevant to anything.  You know, so there's -- if -- are

11  we saying if the motion was granted and if the CI were to

12  testify at trial what --

13         THE COURT:  No, the other way around.  If your

14  motion is granted now --

15         MS. HABER:  His motion or --

16         THE COURT:  Your -- well, yeah, sorry.

17         MS. HABER:  Yeah, his.

18         THE COURT:  Yeah, his motion, the motion's

19  denied.  He doesn't get the information based on your

20  assertion of the privilege.

21         MS. HABER:  Uh-hum.

22         THE COURT:  But I find that it's relevant and

23  if there were to this privilege, the information or

24  concern for the person's safety, that the -- which is not

25  outweighed by the argument, I mean does -- I just want to

56

Proceedings

1  know, does anything happen at trial from your view or

2  just --

3              MS. HABER:  I mean --

4              THE COURT:  -- you know, we all sort of act

5  like it never happened.

6              MS. HABER:  -- I mean if there's a protective

7  order, then there would be no -- you know, if there's a

8  protective order, then he would be precluded from

9  presenting testimony at trial.  That would be the Court

10  order.

11             THE COURT:  Uh-hum.

12             MS. HABER:  And discovery or at trial or maybe

13  we'd have to do this again at trial, but -- at the time

14  of trial but that's -- you know, we're asking for a

15  protective order to prevent him from having any --

16             THE COURT:  No, no, I understand that.

17             MS. HABER:  Yeah.

18             THE COURT:  But he would --

19             MS. HABER:  So for the purpose of trial --

20             THE COURT:  -- not have the information but

21  does he get -- I mean, you're putting him at a rock and a

22  hard place.  I mean, he --

23             MS. HABER:  I mean --

24             THE COURT:  -- doesn't know -- none of us, at

25  least you don't have the grand jury minutes, none of us

57

Proceedings

1   really know -- you know, Rios is the closest that

2   anybody's gotten here to knowing whether this person -- I

3   mean, who knows?  The CI may not have -- maybe he was

4   really going on about Bozman.  I mean, he was going on

5   about the guy in 3E.  Who knows?  I don't know, it might

6   have nothing to do with it though.  You don't know.

7          So does he get an inference?  Does he get

8   instruction?  Does he get nothing?

9          MS. HABER:  I think he gets nothing but he

10  would be able to cross-examine Rios about it.

11         THE COURT:  Uh-hum.

12         MS. HABER:  And Detective Cooke.

13         THE COURT:  All right.  Let me ask you --

14         MR. BAKER:  That got me nowhere at the

15  deposition.

16         THE COURT:  Let me ask, what about -- is there

17  any -- this is the inverse of the question that I asked

18  Mr. Baker, is there anything -- any more -- I mean, Rios

19  gave some information.  So in light of that, is there

20  anymore information that you have that you think could be

21  safely provided?  For example, one thing that Mr. Baker

22  seems to think is important is the order in which the or

23  dates by which or when the CI provided -- became

24  involved, I mean, you know, or mentioned his client, you

25  know and -- I can't say I appreciate every nuance but,

58

Proceedings

1   you know, at least that would give him something.  I mean
2   obviously if -- well, I don't know.  I mean that could be
3   a myriad of possibilities which might reveal the CI
4   identity by a hint, right?  Like I was standing there --
5   I'm not telling you who I am but -- well, you know --
6             MS. HABER:  Right.
7             THE COURT:  Although Mr. Goodloe says he wasn't
8   there, so --
9             MS. HABER:  Right.
10            THE COURT:  -- who knows?  But you get the
11  point.  Is there some way to get closer to, you know,
12  reduce the amount of information that's being withheld
13  while still addressing your very real concern that this
14  person is in a vulnerable position?
15            MS. HABER:  I mean, I think that's the concern,
16  your Honor, is revealing information that could identify
17  -- like dates could definitely identify -- even though
18  Mr. Goodloe said he was not there, maybe one of the co-
19  conspirators was there.
20            THE COURT:  Right.
21            MS. HABER:  Or taking this allegation as true,
22  you know, it could be easy to identify --
23            THE COURT:  Right.
24            MS. HABER:  -- but --
25            THE COURT:  What about the other version that -

59

Proceedings

1   - the other kind of dates which was --

2              MS. HABER:  When the CI --

3              THE COURT:  Talked to the police --

4              MS. HABER:  -- became involved?

5              THE COURT:  Right.  Became involved, talked to

6   the D.A.

7              MS. HABER:  Uhm.

8              THE COURT:  Like things that are not -- are

9   relevant to the way --

10             MS. HABER:  Your Honor?

11             THE COURT:  -- the facts played out in this

12  case, but wouldn't tell you anything about that person.

13             MS. HABER:  Right.

14             THE COURT:  You know, I mean just -- like if

15  it's like I was at the 7-5 and I talked to Officer so and

16  so, I mean, that could be John Doe, Jane Doe, you know,

17  Richard Doe, I don't know, Roe or whoever that is.  You

18  know and --

19             MS. HABER:  I mean, your --

20             THE COURT:  -- it wouldn't tell you anything

21  but at least from what I can gather from our conversation

22  today in these papers, might give the plaintiff more to

23  work with and we would, you know, reduce the pressure on

24  getting the particulars.  And I don't know it's -- it

25  would narrow what we're talking about anyway.

60

Proceedings

1          And then the other -- well, sorry, that's one

2     question.  Do you want to think about it?

3          The other question is I was talking about the

4     grand jury minutes and Rehberg in a minute but --

5          MS. HABER:  Right.  Regarding your first

6     question, I mean in full disclosure, I do not have any

7     documents at all.  And I --

8          THE COURT:  You don't have them and you don't

9     think they exist or what --

10         MS. HABER:  I do know that the NYPD

11    confidential informant unit does have a file with the

12    identity, that kind of thing.

13         THE COURT:  Uh-hum.

14         MS. HABER:  That I do know but they do not

15    provide it to us.  The only -- it's very -- they're very

16    careful on how those documents are handled, of course.

17         THE COURT:  Okay.  But just so I understand,

18    does that mean any document -- is that just the ultimate

19    key that says, you know, CI's Vera Scanlon or is that

20    something --

21         MS. HABER:  Right, it's the key.

22         THE COURT:  Okay.

23         MS. HABER:  And it has nothing to do with Carl

24    Goodloe.

25         THE COURT:  Okay.

61

Proceedings

1          MS. HABER:  But --

2          THE COURT:  But you have documents that are the

3     investigatory file or no, those are with --

4          MS. HABER:  No.

5          THE COURT:  Do they have them?

6          MS. HABER:  I mean everything that --

7          THE COURT:  How does this work?

8          MS. HABER:  As far as I know, I do not believe

9     that there are any documents about the CI, as far as I

10    know.  We're continuing to search but I believe that the

11    information was passed on during the interviews.

12         THE COURT:  And there are no notes.

13         MS. HABER:  No.

14         THE COURT:  Or it would be the D.A.?

15         MS. HABER:  It would be the D.A. and I don't

16    know if there are any but I mean another option if your

17    Honor wanted more information for potentially to bring

18    A.D.A. Rios in for an in camera interview or something of

19    that nature or the NYPD --

20         THE COURT:  Right.

21         MS. HABER:  -- unit could come in with that

22    file for -- I mean, they would bring the original.  They

23    won't even give it to me to give to you.  And we could do

24    an in camera review but I do not think that there's

25    anything --

62

Proceedings

1          THE COURT:  But you're saying that to your

2   knowledge, and you could tell me if your experience is

3   otherwise, that file's just going to say it's Erica Haber

4   or Mr. Baker or Vera Scanlon.  It's not going to tell you

5   anything --

6          MS. HABER:  It --

7          THE COURT:  And maybe the pedigree but it's not

8   going to tell you --

9          MS. HABER:  And I think it might contain

10  information --

11         THE COURT:  About --

12         MS. HABER:  -- I don't know because I've never

13  seen one but it might --

14         THE COURT:  -- being paid or something?

15         MS. HABER:  Right, about that or when the CI

16  was registered and that kind by who and that kind of

17  thing but I don't see how that's relevant to the probable

18  cause analysis.

19         THE COURT:  Yeah, but in my view, we're not

20  necessarily up to that yet.

21         MS. HABER:  Okay.

22         THE COURT:  The question is whether -- what

23  about the file, the regular file in this case?  Does it

24  say hypothetically, the CI reported on -- this is really

25  hypothetical, so -- like the CI reported that he viewed

63

Proceedings

1   the January 6th transaction -- January '06 transaction

2   and then there's a DD5 or whatever, the interview form is

3   or anything like that.

4           MS. HABER:  Not to my knowledge.

5           THE COURT:  Like the regular paper -- because

6   we're not talking about the CI --

7           MS. HABER:  No, not --

8           THE COURT:  -- and you have that file?

9           MS. HABER:  And the DD5 -- yes, I have the --

10  there's not -- there are DD5s for pertaining to

11  confidential informants but I do not believe it's the one

12  at issue.

13          THE COURT:  Okay.

14          MS. HABER:  I would have to go through -- I

15  want to check again.  I don't want to make a blanket

16  statement like there are none at this moment but I'm

17  pretty sure there are not because like I said, I think

18  all of these were interviews with the D.A.  I think it

19  was like a D.A. --

20          THE COURT:  Dealt with the CI.

21          MS. HABER:  -- led charge, right?  Right?

22          MR. BAKER:  I would just observe --

23          THE COURT:  Circle back?

24          MR. BAKER:  -- that, you know, this is an

25  operation involving thirty some-odd defendants, probably

64

Proceedings

1   numerous CIs, numerous buys.  It would shock me if the

2   D.A. claimed or the police claimed that they didn't have

3   a single note of a conversation they had with the CI

4   about anybody in this case.  I mean, how do they keep

5   track of things?  HOW do you keep track of who is saying

6   what about who unless you make a note about it?  And if

7   their position is that there are no notes and there are

8   no Rosario, then let's go to trial and I will put that in

9   front of the jury and let them consider that as another

10  factor in the credibility of the defendants.  Because to

11  me, it just sounds insane that there's no notes of any

12  conversation with a CI when there's giant over a year

13  long investigation where they're making buys every day

14  and the CI's talking about people every day.

15          THE COURT:  Well, we're only talking one CI

16  though, right?

17          MS. HABER:  Right.  And I just said that there

18  are no -- there are DD5s not pertaining to this case.

19          THE COURT:  Okay, right, right.

20          MS. HABER:  You know, and I mean there's memo

21  book entries about CIs and that kind of thing but they're

22  not right.

23          THE COURT:  They're not the ones about Mr. --

24  they're about other parts of this conspiracy.

25          MS. HABER:  As far as I know, but I don't

Proceedings

1    know --

2              THE COURT:  Okay.

3              MS. HABER:  I don't know on -- yeah, I don't --

4    I honestly, I don't -- as far as I know --

5              THE COURT:  All right.  But is there a way for

6    you -- I mean if that's correct, there's no documents --

7    it seems like what, there's four types of information

8    here.  There's the police file documents.  There's

9    whatever the ADA has.  There's the grand jury minutes.

10   There's the secret police file which is more CI-specific

11   than -- I mean, it may tell you -- than case specific, I

12   guess is the way to look at it, maybe that the CI was for

13   just this case but their purpose in keeping it as kind of

14   broader than just this case --

15             MR. BAKER:  What I would like to know is like

16   Ms. Haber said is that the CI -- this particular CI

17   provided historical information about who did what where.

18   Carl Goodloe was a worker.  On what is he basing that

19   information?  Where did he get that information from?

20   That's what we need to know.  Where is he coming up with

21   this?  Is this something he came up with --

22             THE COURT:  All right.  But you can't interview

23   the CI.  Just take that as you're not interviewing the CI

24   here.  So --

25             MR. BAKER:  That's why I would be asking for

Proceedings

1    the adverse inference because it's --

2              THE COURT:  -- if it' snot -- well, I am not

3    the trial --

4              MR. BAKER:  Yeah, but --

5              THE COURT:  I'm just wondering where this is

6    going.

7              MR. BAKER:  I think that's where we're going.

8    I think that --

9              MS. HABER:  Well, that's the information that

10   could reveal the identity of the CI.

11             THE COURT:  What?  Wait, what?

12             MS. HABER:  That's what -- the information he

13   just asked for, where does this information come from?

14   That kind of information could reveal the identity of a

15   CI.

16             THE COURT:  Yeah, we don't even know if that

17   information -- so there's again four pieces for that,

18   right?  You think number one doesn't even exist, is that

19   right?  So can you -- it would eliminate part of this

20   problem --

21             MS. HABER:  Right.

22             THE COURT:  -- if you confirm it doesn't exist,

23   at least we would know that.  And then --

24             MR. BAKER:  No --

25             MS. HABER:  I think --

67

Proceedings

1           MR. BAKER:  Like for example, if hearsay were

2    permitted, Officer Cooke is not going to be able to tell

3    us, you know, where did the CI get this information?  Did

4    you really sit down and talk to this guy?  Where did you

5    find out about him?  How did you know -- did he -- how

6    did he know Carl Goodloe?  Under what circumstances did

7    he have contact with Goodloe?  How did he know Carl

8    Goodloe was a worker?  Did he talk to Carl Goodloe?  Did

9    he buy from Carl Goodloe?  Was he working with Carl

10   Goodloe?

11          THE COURT:  Did you ask those questions?

12          MR. BAKER:  I tried to ask lots of questions

13   like that at the deposition, they were all objected to.

14          THE COURT:  Okay.  All right.  So it's

15   another --

16          MS. HABER:  Your Honor, I mean I think the

17   information would come from testimony of A.D.A. Rios and

18   Detective Cooke, and perhaps even with the grand jury

19   minutes but that -- you know, I would object to any

20   application to unseal those for various reasons.

21          THE COURT:  All right.  What's your point about

22   Rehberg?  You started to -- let's finish the discussion.

23          MS. HABER:  Yeah, my point about Rehberg is

24   that the defendants in this case and the CI would be

25   immune from any liability for their testimony in the

68

Proceedings

1   grand jury --

2             THE COURT:  Yeah, but --

3             MS. HABER:  -- under Rehberg.

4             THE COURT:  Okay.  But there's two things.

5   One, the CI's not being sued.  So this is not a question

6   about his or her immunity and the -- in theory, I mean I

7   think malicious prosecution has become a harder and

8   harder tort to win but basically plaintiff's theory is

9   from day one, this was baloney.  I mean, so any

10  interaction the police had both before and after the

11  grand jury -- and then -- okay, this is going out on a

12  limb, I don't even know if this is the argument but I

13  think this is where you're going.  If you could show they

14  set up the CI to lie, their actions outside the grand

15  jury, not from their own testimony but in basically

16  suborning perjury, would be problematic and potentially

17  support your claim.

18            MR. BAKER:  Yes.

19            THE COURT:  That's not an immune -- they would

20  not be immune.  I have not looked at a case like that.  I

21  just don't see Rehberg as going that far, if you set

22  somebody else up to lie in the grand jury.  The person

23  who is lying might be protected but --

24            MS. HABER:  You know, I just --

25            THE COURT:  I don't know if that clarified

69

Proceedings

1  anything in my own head.  Okay.  So, you can --

2  (indiscernible), you can figure out whether there's

3  anything that we're actually talking about that's in the

4  files.  The grand jury minutes in general, what are you

5  going to do about them?  You're going to make a motion to

6  find out if there is anybody -- I mean, if there were any

7  other minutes besides the CI or the CI plus anyone you

8  don't already have, is that what you're going to do?

9          MR. BAKER:  Yes.

10          MS. HABER:  Yeah, but he would have to make a

11  motion to the state court and give the D.A.'s Office an

12  opportunity to respond.

13          THE COURT:  You know, you can -- I think we

14  talked about this before.  You can look into it.  There

15  are different views about who should handle that but --

16          MR. BAKER:  Right.

17          THE COURT:  I'm not -- I don't have a view.

18          MR. BAKER:  You mean or the state court?

19          THE COURT:  Yeah.  But I don't -- I'm not

20  expressing a view on that.

21          MR. BAKER:  Something to read over the

22  Christmas break?

23          THE COURT:  Yeah.  Yup.  Yup.  Because this

24  case is like a Con Law class, right, from day one.

25          All right.  Then we have the secret identity

70
Proceedings

1  file which I don't know -- okay.  All right.  So besides

2  going back and reading everything in light of what you

3  have said, is there other information that we should get

4  or have in order to figure this out?

5         MS. HABER:  I mean, I would just, you know,

6  reiterate our position that it's not relevant and even if

7  it is relevant, he can't show a compelling need for this

8  very important information.

9         THE COURT:  Now let me ask you one last -- one

10  thing, which is so I have an ex parte letter from the

11  City explaining what cognitive impairment means.  Is

12  there any problem with me relying on that?  You're not

13  going to -- I mean, this is -- because it's a privilege.

14  I mean, that would be normally how a privilege would be

15  asserted.  You can have an in camera review and say yes,

16  they're correct that the privilege applies.  But is there

17  any --

18         MR. BAKER:  Well, I don't know what evidence

19  they presented to --

20         THE COURT:  Well, no, I know you don't.  That's

21  the point.

22         MR. BAKER:  Well, I would ask that medical

23  records be provided to the Court.

24         MS. HABER:  How --

25         THE COURT:  All right.  Whatever, but -- I'm

71

Proceedings

1   not doing that.  I just want -- I'm talking about the

2   letter.

3           MR. BAKER:  Oh, the letter?  Without -- I would

4   like to -- yeah, I would like the letter to be disclosed,

5   so I could respond to it.

6           THE COURT:  All right.  But there's a different

7   -- the argument is a little bit -- the question I am

8   asking is a little bit different which is assuming you're

9   not going to see it, is that mean it's something I

10  shouldn't take into -- I can't take into account, given

11  this is essentially a privilege or is it something I can

12  take into account, right?

13          MR. BAKER:  Take into --

14          THE COURT:  If you analogize this to an

15  attorney-client privilege dispute or whatever, I often do

16  in camera reviews and say yes, this document is in fact

17  what you say it is, you know, a privileged document.  So

18  here -- provided not the identifying information, just

19  information about what cognitive impairment means and the

20  question is can I rely on that -- I don't mean rely on it

21  like a truthful, I mean the fact that you haven't seen

22  it, is that a reason why I can't take it into account or

23  I can take it into account?

24          MR. BAKER:  I think you can take it into

25  account.

Transcriptions Plus II, Inc.

72

Proceedings

1        THE COURT:  Because?

2        MR. BAKER:  Because it's just one-sided.  I

3   have no way of responding --

4        THE COURT:  But aren't all privilege disputes

5   one-sided?  You don't usually ever see the document or

6   information that's claimed to be privileged.  And here

7   the thing that's being privileged is the identity of the

8   person -- identity, you know, name and/or other

9   identifying characteristics.

10        MR. BAKER:  Well, it is --

11        THE COURT:  So isn't the privilege review an

12   exception to this, you know, the general --

13        MR. BAKER:  There should be an exception is --

14        THE COURT:  Exception to the exception?

15        MR. BAKER:  Exception to the exception.  I

16   mean, my -- this is the person that's putting my client

17   in a conspiracy and the best way for a claimant to find

18   out the facts is to depose the person and question him

19   and that relying on the letter that was, you know, an ex

20   parte letter is, I don't think it's protecting my

21   client's interests.

22        THE COURT:  What's the City's view?

23        MS. HABER:  I would argue that you absolutely

24   can consider it.  I mean, I believe in the In Re City of

25   New York, the Second Circuit case.  The Court's reviewed

73

Proceedings

1  in camera, the documents at issue and ruled that they

2  were privileged and based their decision on their in

3  camera review of the documents.

4          THE COURT:  Right.  I mean, that's the general

5  practice.  So I'm just the question really is there any

6  reason to look at this differently?  Because if you

7  reveal the secret to you, I mean that kind of gets back

8  to you or we could do this attorney's eyes only then the

9  proverbial cat is out of the bag.  I mean, and given that

10  defendant's counsel doesn't even know who that person is,

11  you know, I mean, maybe she could piece it together in

12  the same way you could piece it together with the little

13  bit of information she has but it would --

14          MR. BAKER:  I'm not sure actually --

15          THE COURT:  -- take quite an effort.

16          MR. BAKER:  I'm not sure actually that the

17  identification of the person is really -- other than if

18  it's relevant to, you know, how well they know my client.

19          THE COURT:  Sure.  I mean, isn't it?  Maybe

20  this is all -- this is not to say about your client

21  particularly, right?

22          MR. BAKER:  Okay.

23          THE COURT:  Some cases are vendettas by the

24  complaining witness, right?  Really, the police just are

25  taking the complaints.  It's not the way this case looks

74

Proceedings

1   like but my point being that in general probably in a

2   small community like this being the --

3               MR. BAKER:  It could be a rival.

4               THE COURT:  Yeah.

5               MR. BAKER:  I mean, it could somebody that has

6   it in for Mr. Goodloe.

7               THE COURT:  Sure.

8               MS. HABER:  But the only way that you would be

9   able to learn about that is by revealing the identity of

10  the CI --

11              THE COURT:  Right.

12              MS. HABER:  -- to your client.

13              THE COURT:  No, exactly.  Right.

14              MS. HABER:  So that's --

15              THE COURT:  Exactly.

16              MR. BAKER:  Well, that's why we're in this jam.

17  It's --

18              THE COURT:  We're in a jam.

19              MR. BAKER:  We're in a jam.

20              THE COURT:  The question is how do you balance

21  these two things?

22              MS. HABER:  I mean I think we did provide

23  enough information.  The A.D.A. testified pretty much

24  what information she learned.  She didn't testify about

25  dates or, you know, how they connected Carl Goodloe to

75

Proceedings

1   the conspiracy but they did say that the CI provided

2   information that connected him to conspiracy and she knew

3   from the CI that he was a worker and that was additional

4   information, in addition to the sale that --

5               THE COURT:  Uh-hum.

6               MS. HABER:  And I think that is generally what

7   the CI testified.  I mean, A.D.A. Rios said that on the

8   record.

9               MR. BAKER:  I think what really is at the heart

10  of the matter, is really the relationship, if any,

11  between the CI and my client.  And if it turns out to be

12  a person that we don't --

13              THE COURT:  I thought it was the cops who had

14  it out for client?

15              MR. BAKER:  They --

16              THE COURT:  I mean isn't that --

17              MR. BAKER:  Yes.

18              THE COURT:  -- the mega meta theory, whatever

19  you said.  They hated him.

20              MR. BAKER:  Well, in other words, your Honor,

21  if --

22              THE COURT:  I mean obviously speaking

23  colloquially but they were out to get him because they

24  were mad about their colleagues having a problem because

25  of the 2005 arrest and --

76

Proceedings

1        MR. BAKER:  Yes, Judge.

2        THE COURT:  -- false arrest, right?

3        MR. BAKER:  Yeah, I'm not sure -- we don't know

4   if the CI acted because he was being truthful like the

5   City claims, or he had a vendetta against my client or he

6   was put up to it by the police.  There's no way for us to

7   know that unless we have all the information.

8        THE COURT:  All right.

9        MS. HABER:  But even if the CI was not being

10  truthful, the officers were entitled to rely on it unless

11  there was some reason to doubt the CI's veracity and, you

12  know, I think --

13       THE COURT:  Yeah, but well -- right.

14       MS. HABER:  I mean I --

15       THE COURT:  So but the problem with that is, I

16  mean --

17       MS. HABER:  But that goes back to false arrest.

18  I mean, this isn't even a false arrest case.  This is a

19  malicious prosecution -- you know, this is malicious

20  prosecution.

21       THE COURT:  Well, but --

22       MS. HABER:  We have to go by the indictment.

23       THE COURT:  Yeah, but if you go to Mr. Baker's

24  theory, which is the police -- whatever.  There was

25  solidarity among officers and for that reason, when they

77

Proceedings

1   had this big problem where Mr. Goodloe spent a lot of his

2   time, they were just able to tack him on and cause him a

3   lot of pain and suffering by having him spend many, many

4   months in jail for something he didn't do and they knew

5   it because they knew they were making it up.  And they

6   had a situation that they could manipulate.  And so -- I

7   mean, that's the theory, whether there's any truth to it,

8   I have no idea.

9              MS. HABER:  Yeah.  Could I just point out

10  though at plaintiff's deposition he didn't even deny

11  being there.  He said, "I don't know if I was there on

12  that date.  I don't know if I was there on that date.  I

13  don't know.  I don't know.  I don't know."

14             So he can proclaim his innocence all he wants

15  but at the deposition, he didn't really deny it.  He just

16  said, "I don't know.  I don't remember. I don't remember,

17  Ms. Haber.  I don't remember, Ms. Haber."  So --

18             MR. BAKER:  Again, at the time of his

19  deposition perhaps he didn't remember specifics but he's

20  -- in the complaint, he's made his claim.  So that's what

21  the claim is.

22             THE COURT:  All right.

23             MR. BAKER:  You could cross-examine him about

24  that at trial.

25             THE COURT:  All right.  Yeah, I don't know what

78

Proceedings

1   that means, right?  You could ask me where I was in

2   January '06, I would be like, I have no idea.

3          MR. BAKER:  The fact is he knows that he didn't

4   sell drugs in Larry Bozman's apartment.  He knows that

5   and he said so in his complaint and certainly, you could

6   cross-examine him about that at trial, absolutely.

7          THE COURT:  All right.

8          MR. BAKER:  It goes to his credibility.

9          THE COURT:  Anything else?  So can you -- when

10  can you look at the file and let us know?

11         MS. HABER:  I mean, your Honor, I mean --

12         THE COURT:  We're talking about anything you

13  have, just so we can clear up that part of this.

14         MS. HABER:  I'm leaving town next week myself.

15  We were talking about vacation earlier.

16         THE COURT:  Are you?

17         MS. HABER:  But I'm only going for a few days.

18  If I could have till maybe the January 5th or the end of

19  that week?

20         THE COURT:  Wait a minute.  Let me just pull up

21  the docket.  I suppose you are taking more modest

22  vacation than many other folks are apparently.  All

23  right, so --

24         MS. HABER:  Yes, not even a week.

25         MR. BAKER:  Don't feel so bad -- I'm taking a

79

Proceedings

1    day off for a surgical procedure.  That's my day off.

2              MS. HABER:  Oh.

3              THE COURT:  Hopefully a day to recover, right?

4              MR. BAKER:  It's not a big one.

5              THE COURT:  I don't know.  I never believe

6    them.

7              MR. BAKER:  Preventative.  It comes when you

8    hit fifty.  Enough said.

9              THE COURT:  I still think you should take

10   another day off.

11             MS. HABER:  That's true.

12             THE COURT:  I never believe the doctor when

13   they're like, oh, this is just this.

14             MR. BAKER:  I would love to.

15             THE COURT:  I'm always like, if this were your

16   pain, you wouldn't be happy.  All right.  So let's see.

17   All right.  You're supposed to be wrapping up but this is

18   a case that keeps on giving.

19             MS. HABER:  Yeah.

20             MR. BAKER:  Give him some more than you're

21   already offered him.  I mean, get rid of it.

22             THE COURT:  All right.  Well, we'll talk about

23   that in one second.  When's the last time we entered the

24   schedule?

25             MS. HABER:  I think discovery was technically

80

Proceedings

1   closed in July.

2           THE COURT:  Except for this?

3           MS. HABER:  Yeah.

4           MR. BAKER:  Well, there were --

5           THE COURT:  Except what about the grand jury

6   minutes?  That's where I thought -- we talked about that

7   before.

8           MS. HABER:  Actually, I think we extended

9   discovery for like a -- we did the Michelle King (ph.)

10  responses --

11          THE COURT:  Right.

12          MS. HABER:  -- and that kind of thing.

13          MR. BAKER:  There were some other things I

14  brought up in the motion that -- the date of the

15  photograph, we still have to establish that.  The date

16  the photograph was taken.  They said in the deposition

17  they could find out.  We never got word back from Cooke

18  on that.

19          MS. HABER:  I don't know how they can find out

20  the date of that.

21          MR. BAKER:  Look in the PIMS (ph.).  He said

22  it's in the PIMS complaint.

23          MS. HABER:  But that picture was taken in --

24  that photo array was generated in 2006.

25          THE COURT:  Yeah, they had PIMS back then.

81

Proceedings

1   They --

2           MS. HABER:  It's my understanding if the

3   records are sealed -- for example, this case, if that --

4   this case would no longer be in PIMS.  I don't know.  I

5   don't -- I mean, I don't see how that's relevant to

6   anything either.

7           MR. BAKER:  Well, if the same photograph --

8           THE COURT:  Well, no, but he -- right, exactly.

9           MS. HABER:  What's that?

10          MR. BAKER:  It's the same photograph from his

11  2005 arrest, it's certainly relevant.

12          MS. HABER:  But why?

13          MR. BAKER:  Because it shows motive that first

14  of all, that should have been sealed and they should

15  never have had that file.

16          MS. HABER:  But he had like twenty prior

17  arrests.

18          MR. BAKER:  Yeah, but they claim --

19          MS. HABER:  That could have been any photo from

20  any of those prior arrests if he pled guilty.

21          THE COURT:  All right.  What do you want to do?

22  It seems to me, there's this issue and the grand jury

23  minutes.  I mean I am not sure why they've done that but

24  do you need them, do you want them --

25          MR. BAKER:  Yes, I do.

82

Proceedings

1        THE COURT:  Are you going to try --

2        MR. BAKER:  I want the testimony of the CI at

3  the grand jury and I want all the --

4        THE COURT:  No, I understand the CI issue here.

5  I mean, maybe some state court judge will feel different

6  but do we not -- did you ask any A.D.A. Rios if anybody

7  else testified?  Do we know the answer?  I mean, is this

8  just an effort --

9        MR. BAKER:  The answer to --

10        THE COURT:  To whether anyone else testified?

11  You have the -- your discovery in the criminal case, you

12  have got some discovery, right, from the --

13        MR. BAKER:  I did.  I got --

14        THE COURT:  -- including certain grand jury

15  minutes, right?

16        MR. BAKER:  Yes.

17        THE COURT:  We think the CI testified in the

18  grand jury.  Was there anyone else who testified?

19        MR. BAKER:  Cooke and the undercover testified

20  and --

21        THE COURT:  And you have that?

22        MR. BAKER:  We have that.

23        THE COURT:  Is there anybody else?

24        MR. BAKER:  Not that I'm aware of.  I may not

25  know but that's the only --

83

Proceedings

1          THE COURT:  Oh, all right.  So that's --

2          MR. BAKER:  Yeah.

3          THE COURT:  Let me ask a really

4   (indiscernible).  The indictment was for multiple people?

5          MR. BAKER:  Yes.

6          THE COURT:  I mean, how were there not other

7   people?

8          MR. BAKER:  Excuse me?

9          THE COURT:  How were there not other people

10  testifying?

11         MR. BAKER:  Oh, I'm sorry, Judge.  There were

12  lots of other officers testifying.  Yes, there were the -

13  - yes.

14         THE COURT:  I mean, don't you usually do just

15  one big --

16         MR. BAKER:  And the grand jury presentation --

17  there were tons of officers.

18         THE COURT:  But you think you have everybody

19  who was related to Mr. Goodloe --

20         MR. BAKER:  Except for the CI.

21         THE COURT:  -- except for the CI.

22         MR. BAKER:  Yes.

23         THE COURT:  All right.

24         MR. BAKER:  I believe I do.

25         THE COURT:  Well, then you don't really need --

84

Proceedings

1  well, I thought you were saying earlier you didn't know

2  whether you had gotten all of the relevant testimony.

3          MR. BAKER:  I was referring to the CI

4  testimony.

5          THE COURT:  Okay.  All right.  So then I can --

6  we'll deal with the CI.  I mean, you may -- I don't know

7  procedurally that's a different question.

8          MS. HABER:  Your Honor, may I interject for a

9  second?

10          THE COURT:  Sure.

11          MS. HABER:  With regard to the grand jury

12  testimony that he has because it was provided in the

13  criminal case, there's no protective order with regard to

14  that, could we submit a proposed protective order if he's

15  going to use it at trial or whatever so that we just make

16  sure that those minutes are protected in the context of

17  this case?

18          I mean he knows -- because he got it as the

19  lawyer for the criminal defendant, he didn't have to go

20  through the channels.  You know what I'm saying?

21          THE COURT:  It doesn't matter.

22          MS. HABER:  To unseal, like you know, like

23  they're not unsealed.

24          THE COURT:  You mean they're out -- I mean they

25  weren't --

85

Proceedings

1          MS. HABER:  Like they're not unsealed.  They're

2   not unsealed.

3          THE COURT:  What are they?  I don't know.

4          MR. BAKER:  They were turned over, as part of

5   open filed discovery.  So I'm --

6          THE COURT:  So I don't know enough about the

7   New York State criminal process to know whether that

8   means they're just out in the public now.

9          MR. BAKER:  They're out in the public.

10         MS. HABER:  No.

11         MR. BAKER:  They're out.

12         MS. HABER:  No, they're not, your Honor.  My

13  understanding is that they can only be used for the

14  purpose of the criminal trial and then once the criminal

15  trial is over, they're sealed and then you have to get --

16  that's why you have to make a motion to the state court

17  to use them in any other proceeding.  You know, I think

18  we've talked about but because they're out --

19         THE COURT:  I don't know the answer.

20         MR. BAKER:  I'm not aware of that, Judge,

21  because I don't remember any order being -- but I don't

22  want to -- I'll find out.

23         MS. HABER:  Grand jury minutes, that's the

24  whole thing with secrecy, they're always sealed.  They're

25  always sealed but the statements of the officers against

86

Proceedings

 1   the client are turned over as Rosario -- against the

 2   criminal defendants are turned over as Rosario, right, or

 3   as --

 4            MR. BAKER:  I think --

 5            MS. HABER:  -- before trial.

 6            MR. BAKER:  I think what, Ms. Haber, what you

 7   might need to do is you might need to contact the D.A.'s

 8   Office and have them provide to you whatever stipulation

 9   or agreement they had with the Court because there's open

10   -- it's so routine over there in state court that nobody

11   ever asks or thinks about the actual agreement.  There is

12   an agreement that's in place for open-filed discovery.

13            MS. HABER:  In criminal cases but not for use

14   in civil cases.

15            MR. BAKER:  Well, I don't know where it says

16   that.  I have never seen anything that says that.

17            THE COURT:  I don't --

18            MR. BAKER:  I've just received the stuff --

19   they give you a letter in open court.  They give it to

20   the co-defendants so everybody's got it, you know.  It's

21   pretty loosey-goosey so-to-speak.

22            THE COURT:  First of all, we have a protective

23   order, right, in this case?

24            MS. HABER:  We have it for the purpose of the

25   confidential --

87

                    Proceedings

1            THE COURT:  All right.  So you --

2            MS. HABER:  -- disciplinary records.

3            THE COURT:  It doesn't let information be

4   designated as confidential?

5            MS. HABER:  Oh, yeah, I guess it does.

6            THE COURT:  It usually does.

7            MS. HABER:  Yeah, I guess it does.

8            THE COURT:  Okay.  So why don't we --

9            MR. BAKER:  I would agree not to --

10           THE COURT:  -- just for now, until you figure

11  this out, treat those grand jury minutes as confidential

12  pursuant to that order.

13           MR. BAKER:  Of course, Judge.

14           THE COURT:  But you all should follow-up

15  because I have no idea what the answer is to this

16  question about -- I guess, I don't know.

17           MS. HABER:  But the Second Circuit --

18           THE COURT:  I assumed when they were released

19  for the criminal case, they were released but that could

20  be a wrong assumption.

21           MS. HABER:  There's Second Circuit -- well, no,

22  never mind.  I'm getting confused.  But they are -- it's

23  my understanding that the minutes are sealed.

24           THE COURT:  It's a limited release.

25           MS. HABER:  Especially where the charges have

88

                              Proceedings

1  been dismissed.  Like all grand jury minute are sealed.

2  That's what -- if, you know -- what's in the news today,

3  like that's why they can't unseal the testimony of the

4  grand jury.  All minutes are sealed.

5              MR. BAKER:  (Indiscernible) case dismissed

6  against Goodloe's that's sealed.

7              MS. HABER:  No, I mean it's sealed.  The

8  minutes are always sealed.  So to use them -- it's my

9  understanding --

10             THE COURT:  Yeah, but the ones that are in

11  the --

12             MS. HABER:  -- because they're out, I know it's

13  like --

14             THE COURT:  Right, that's what I don't know the

15  answer.  Right.  You're asking the right question but the

16  ones that the news has been talking about, there was no

17  indictment, and so they're sealed and so that's why

18  there's that special proceeding to unseal them and your

19  argument is that the release for purposes of a disclosure

20  in a criminal case is a limited disclosure.

21             MS. HABER:  Right.

22             THE COURT:  And I don't know whether that is

23  correct or not.  I --

24             MR. BAKER:  Because Mr. Baker --

25             THE COURT:  No one's ever said, it's always

89

Proceedings

1    sort of -- it's always, once they're out, they're out.

2              MS. HABER:  Right, if Mr. Baker wasn't the

3    criminal attorney, we would not have these grand jury

4    minutes.  We would have to go to the Court to get them.

5              MR. BAKER:  Well, my --

6              MS. HABER:  The only reason --

7              THE COURT:  Well, but he's the defendant -- I

8    mean, the defendant is the same person.  It's not just

9    the attorney.

10             MR. BAKER:  Yeah, the plaintiff would have it.

11             THE COURT:  The plaintiff himself, the --

12             MS. HABER:  No -- okay.  I just want to issue

13   the protective order --

14             THE COURT:  Okay.

15             MS. HABER:  -- to protect it because it's my

16   understanding --

17             THE COURT:  Okay.

18             MS. HABER:  -- that they are sealed.  We can't

19   use them in the context of the case.  They can be used

20   for --

21             THE COURT:  All right.  Are they in here?

22             MR. BAKER:  I don't think we used any grand

23   jury minutes, Judge, in the exhibits.

24             THE COURT:  No.

25             MS. HABER:  No.

90

Proceedings

 1          THE COURT:  No, okay.  Okay.  I don't know the

 2  answer.

 3          MS. HABER:  I mean I think now --

 4          MR. BAKER:  We'll look --

 5          MS. HABER:  Yeah.

 6          THE COURT:  I mean what do we know?

 7          MR. BAKER:  Let's you and I look into that.

 8          MS. HABER:  Okay.  I mean I think that it is

 9  now -- I was before Judge Levy the other day on a similar

10  or a couple of weeks ago on a similar issue where the

11  plaintiff's attorney got the minutes and, you know, we

12  asked for a protective order for the same reason and he

13  said what you said, well it's kind of the cat's out of

14  the bag now but if you submit a proposed order, I'll so

15  order it.

16          MR. BAKER:  Well, I won't.

17          MS. HABER:  So just to keep them

18  confidential --

19          MR. BAKER:  I haven't disseminated them.

20  There's no reason to.  Nobody's asked me to and I

21  wouldn't if they asked because it's all about Goodloe's

22  case and I don't even know -- I don't believe he's got a

23  copy of the grand jury minutes.  He may have read them in

24  my office, but he doesn't have them.

25          THE COURT:  All right.  But the question is --

91
Proceedings

1    all right.  But the question is what can you do with them
2    and then I guess it raises the issue about what happens
3    at trial because --
4            MR. BAKER:  Well, they should be unsealed for
5    purposes of cross-examination if that's --
6            THE COURT:  I'm not disagreeing I'm just saying
7    that we don't know --
8            MR. BAKER:  Right.
9            THE COURT:  -- what the --
10           MS. HABER:  That's the point.
11           THE COURT:  -- where we are.
12           MS. HABER:  Because you have them and you're
13   going to use them for impeachment and whatnot, then I
14   just want them under a protective order of some sort
15   which maybe you're, you know --
16           THE COURT:  Well, I'm saying until you get back
17   to me about what the status is and then if whether the
18   protective order should continue but I'm not looking at
19   your protective order but what I generally write is then
20   the issue is not decided for trial.
21           MS. HABER:  Okay.
22           THE COURT:  And trial right, you would,
23   normally use that kind of material but if they're -- I
24   don't know what they are -- still sealed, I don't know,
25   it presents a conundrum.

92

Proceedings

1          MS. HABER:  That's right.

2          THE COURT:  We need more information.  If you

3   think there's this agreement it would be helpful to get

4   that.

5          MS. HABER:  I don't know what agreement --

6          THE COURT:  See what the letter says.

7          MS. HABER:  I mean, I don't know if --

8          MR. BAKER:  I'll unseal all the grand jury

9   minutes, not just the CI's minutes.

10         THE COURT:  Well, yeah, I mean that would

11  obviously be the follow-up to this.

12         MS. HABER:  But then that's what, testimony

13  from thirty-seven people, your Honor.  This case was

14  indicted once and then they had to start over.  I mean,

15  this is like months and months of testimony.  It's

16  complete -- it's just to have all these officers.  It's

17  just nothing is relevant.  There's grand jury secrecy.  I

18  mean, to unseal the whole thing --

19         THE COURT:  I'm not --

20         MS. HABER:  -- I would object.

21         THE COURT:  I don't think Mr. Goodloe cares

22  about all that, I mean so far he doesn't.

23         MR. BAKER:  Just with respect to his case.

24         MS. HABER:  Okay.

25         THE COURT:  He just cares about -- Mr. Baker

93

Proceedings

1   just cares about Goodloe.

2           MS. HABER:  Okay.

3           THE COURT:  What you think are --

4           MS. HABER:  I thought you meant the whole

5   thing.

6           THE COURT:  But no, no, no.  But he's saying

7   the three.

8           MR. BAKER:  What are you hiding something?

9           THE COURT:  Right, he's talking about the

10  three, the CI and the two others, right?  That's what

11  you're talking about.

12          MR. BAKER:  Right, Judge.

13          THE COURT:  But -- okay, but then that doesn't

14  make sense for you to make that motion until we decide

15  here.

16          MR. BAKER:  I agree.

17          THE COURT:  So --

18          MR. BAKER:  That's fine.

19          THE COURT:  -- let's back burner that for a

20  second.

21          MS. HABER:  Well, if he's going to move to

22  unseal the CI, he could just move to unseal all of them

23  and that would avoid --

24          THE COURT:  Sure, it could be the other way

25  around though.  He may need to unseal the other two, even

94

Proceedings

1   though he's not going to be allowed to get the CI.

2            MS. HABER:  Right.  Right.

3            THE COURT:  That's the trial issue, right?  It

4   doesn't need to hold us up if you are getting just those

5   other two because you could deal with it sealed for now

6   and then when you get the unsealing order or whatever --

7            MR. BAKER:  So I should move forward with the

8   unsealing order, right?

9            THE COURT:  I think we should check in in a

10  couple of weeks --

11           MR. BAKER:  Okay.

12           THE COURT:  -- and see where we're at with --

13           MR. BAKER:  Okay.

14           THE COURT:  -- because the answer to this

15  question with figuring this thing out and see which way

16  we should go.

17           MS. HABER:  I think we can do a proposed order

18  for the minutes that he already has but I --

19           THE COURT:  They're covered by the

20  confidential --

21           MS. HABER:  Okay.

22           THE COURT:  I'm just saying it on the record.

23           MS. HABER:  Okay.

24           THE COURT:  So they're covered by the existing

25  confidentiality order.  They're designated for now until

95

Proceedings

1   we know the answer to whether they are technically field

2   for purposes other than use by the criminal defense and

3   then we'll figure out where to go.  All right.

4           Besides this issue, is there any other

5   discovery?

6           MR. BAKER:  One second, Judge.

7           THE COURT:  Uh-hum.

8           MR. BAKER:  Just that photograph and the date

9   that photograph was taken.

10          MS. HABER:  Well, I provided you a color copy

11  of the photograph.

12          MR. BAKER:  It doesn't have a date on it.  I

13  need to know when that photograph was taken --

14          MS. HABER:  I don't know --

15          MR. BAKER:  -- if it was taken on September of

16  '05.  It's got to be somewhere.

17          MS. HABER:  In the photo array?

18          MR. BAKER:  Yes.

19          MS. HABER:  We object.  We object.

20          THE COURT:  Why?

21          MS. HABER:  Because it's not reasonably

22  calculated to lead to the discovery of admissible

23  evidence, the date on which the photo and the photo array

24  was taken.

25          MR. BAKER:  It's relevant.

Transcriptions Plus II, Inc.

96

Proceedings

1          THE COURT:  Why is it burdensome?

2          MS. HABER:  Because as far as I know, that was

3   conducted through a computer system in 2006 and as far as

4   I know, they -- when you enter -- it's in the testimony.

5   He explains what happened but what happens --

6          MR. BAKER:  If it (indiscernible) --

7          MS. HABER:  -- but when you look for a -- when

8   you're organizing a photograph or somebody organizing a

9   photo array, the computer just generates the most recent

10  pictures, is my understanding, right?

11         MR. BAKER:  Wait.

12         MS. HABER:  We have a --

13         THE COURT:  Wait.  Can't you tell when it was

14  entered though?

15         MR. BAKER:  It's got to be a date -- yes,

16  Judge.

17         THE COURT:  Without a lot of work?

18         MR. BAKER:  The answer is yes.  He testified at

19  the hearing that it's a PIMS system.  He can go into the

20  PIMS system and check.

21         THE COURT:  What does that mean PIMS?

22         MR. BAKER:  It's a -- I forget what it stands

23  for but it's the system that use to generate photo

24  arrays.

25         THE COURT:  Okay.

97

Proceedings

1          MR. BAKER:  It's a computerized system.  It's

2   been use for years.  And they could plug in his NYSID

3   number and up will pop whatever picture pertains to him

4   and they could look at the picture from the photo array,

5   look at what pops up in PIMS and figure out which one it

6   was they used.  That's it.

7          THE COURT:  And there's a date --

8          MR. BAKER:  And there's a date.

9          THE COURT:  -- associated with that.

10         MR. BAKER:  He said there's a date.  Yeah,

11  that's what he testified to.

12         THE COURT:  I think if that's all it is, you

13  should do that or get somebody at the police department

14  to do that.  If it turns out to be more complicated, and

15  you're spending a lot of money or a lot of time, come

16  back and let me know.

17         MS. HABER:  Okay.

18         THE COURT:  But if that's all it is --

19         MS. HABER:  I don't think --

20         THE COURT:  Because I think --

21         MS. HABER:  I don't know, your Honor.

22         THE COURT:  All right.

23         MS. HABER:  I mean I don't know why it's

24  relevant at all.

25         THE COURT:  Because the theory of the case is

98

Proceedings

1   that they -- well, let me back up.  There's theoretically

2   the follow-up question.  It could be randomly that the

3   computer generated and I guess this isn't a question,

4   assigned his picture from 2005 to the photo array, right?

5   That's a -- is that a possibility?

6               MR. BAKER:  It's possible that it was random

7   but I -- it seems to me that it would support my case and

8   also would be another argument to show that these

9   officers --

10              THE COURT:  They knew.

11              MR. BAKER:  -- were acting in bad faith because

12  they're using a photograph that should have been

13  destroyed pursuant to 160.50.

14              THE COURT:  Yeah, I think it's --

15              MS. HABER:  But it's not on them to destroy the

16  photograph.  Like I --

17              MR. BAKER:  It is.  Yes, it is.  It's on them.

18  They're the ones who are the arresting officer.

19              MS. HABER:  No, it's not up to Detective

20  Christopher Cooke to destroy photographs of every --

21              MR. BAKER:  The statute says it's on them.

22              MS. HABER:  All right.

23              THE COURT:  Interesting.  I didn't know that.

24              MR. BAKER:  I believe it does.

25              MS. HABER:  I --

99

Proceedings

1          MR. BAKER:  It says the police are obligated to

2  destroy or send the material back to the arrestee, notify

3  the criminal justice agency.

4          MS. HABER:  Has Carl Goodloe gotten his photos

5  back on every arrest?

6          MR. BAKER:  Never.  And that's our next

7  lawsuit.

8          MS. HABER:  I mean, like this is --

9          THE COURT:  All right.  Well, that's somebody's

10  big class action.

11          MS. HABER:  Okay.  This is just, you know -- I

12  mean, there's a statute of limitations.  I mean there's

13  this --

14          THE COURT:  Just find out what the story is

15  about --

16          MS. HABER:  Okay.

17          THE COURT:  -- whether that was the picture

18  and --

19          MS. HABER:  Okay.

20          THE COURT:  And, you know, don't go crazy but

21  get --

22          MS. HABER:  Okay.

23          THE COURT:  -- if it's really what was said in

24  the deposition and it is a modest amount of work, it's

25  arguably relevant.

100

Proceedings

1           THE COURT:  Okay.  So there's this issue.  Any

2   other -- all right.

3           Let me for the next two minutes and then I'm

4   going to go -- settlement.  Okay.  I mean we're on the

5   record here but have you talked about it at all?

6           MR. BAKER:  Not really.  There hasn't been any

7   change in the City's position.  You know, I think the

8   last offer was --

9           MS. HABER:  Are we saying it on the record?

10          THE COURT:  No, here I'll turn it off.

11          MS. HABER:  Okay.

12          THE COURT:  I'm going off the record.

13          MS. HABER:  Thank you.

14          (Off the record)

15          THE COURT:  Okay.  So we're looking at January

16  9th for basically an update on these outstanding issues

17  which are the photograph, whether the grand jury minutes

18  that were released in the criminal case are still --

19  sealed for the purposes of this case and for now, they're

20  confidential under the confidentiality order and the --

21  what it is, if anything, the defendants -- the D.A.

22  and/or the NYPD has about this case in the case-specific

23  files.  We're not talking about the -- I don't know what

24  you want to call it -- the background file on the CI for

25  now.Do you know if that exists or you're just saying as a

101

Proceedings

1  general thing that exists for CIs but you don't know?

2           MS. HABER:  I do know that that exists.

3           THE COURT:  Okay.  All right.

4           MS. HABER:  Yes.

5           THE COURT:  So there's something else.  Okay.

6  So January 9th.  All right.  Enjoy your days off.

7           MR. BAKER:  Judge, do you want us --

8           THE COURT:  Yes, sorry.

9           MR. BAKER:  -- here?

10          THE COURT:  No, no, you could do it in a

11  letter.  If we need to call, we'll have one.

12          MR. BAKER:  Okay.

13          THE COURT:  And then obviously the fourth thing

14  is if they're really -- you know, think about how this

15  looks -- how this all plays out at trial, it might affect

16  what you think about this whole case or not.  I mean, it

17  may make you feel stronger, weaker, I don't know, you

18  know?  Think about all the briefs you're going to write

19  for Judge Matsumoto.

20          MS. HABER:  She's going to love this case.

21          THE COURT:  Yup.  All right.  Thanks.

22          MR. BAKER:  Okay.  Thank you, Judge.

23          MS. HABER:  Thank you, your Honor.

24              (Matter concluded)

25                  -o0o-

102

# C E R T I F I C A T E

I, LINDA FERRARA, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **30th** day of **April**, 2015.

*Linda Ferrara*
Linda Ferrara

CET**D 656
Transcriptions Plus II, Inc.