UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- x
CARL GOODLOE,                                         :
                                                     :
                      Plaintiff,                      :
                                                     :                    **ORDER**
             -against-                                :        12 CV 3018 (KAM) (VMS)
                                                     :
CITY OF NEW YORK, UNDERCOVER                          :
POLICE OFFICER #2570, DETECTIVE                       :
COOKE, DETECTIVE DAUGE, SERGEANT                      :
RAMIREZ, POLICE OFFICER FRANK                         :
CHIODI, AND JOHN DOE POLICE OFFICERS                  :
1-5 of the NEW YORK CITY POLICE                       :
DEPARTMENT,                                           :
                                                     :
                      Defendants.                     :
-------------------------------------------------------- x

**Scanlon, Vera M., United States Magistrate Judge:**

In this civil rights action brought pursuant to 42 U.S.C. §§ 1981, 1983 and 1985, Plaintiff

Carl Goodloe ("Plaintiff") alleges in his Amended Complaint that Defendants City of New York,

Undercover Police Officer #2570, Detective Cooke, Detective Dauge, Sergeant Ramirez, Police

Officer Frank Chiodi, and John Doe Police Officers 1-5 of New York City Police Department

("NYPD" and, collectively, "Defendants") violated his constitutional rights by subjecting him to

a malicious prosecution which caused Plaintiff a loss of liberty and property. Docket No. 18.

Before the Court is Plaintiff's motion to compel Defendants to produce records relating to a

confidential informant's ("CI") provision of information to law enforcement which, according to

Defendants, provided probable cause for Plaintiff's prosecution for drug conspiracy charges.

Docket No. 32-35. Defendants oppose. Docket No. 36. I held a motion hearing. Docket No.

39.

I **deny in part** and **grant in part** Plaintiff's motion to compel. Within ten days of the

entry of this Order, Defendants must produce to Plaintiff the following information: the amount

of monetary compensation the CI received for the information provided to police (Defendants have already disclosed to Plaintiff that the CI received monetary compensation), whether the CI was a registered confidential informant and when the CI had last provided useful information to law enforcement prior to providing information about Plaintiff. Defendants need not produce the balance of the requested CI information as explained below.

## I.   Background

### a.   Factual Background

The following facts are primarily drawn from Plaintiff's counsel Harold Baker's affidavit in support of this motion to compel and supporting exhibits. <u>Docket No. 33</u>. When necessary for completeness, I have cited to Defendants' counsel Erica M. Haber's affidavit and exhibits submitted in opposition to the motion and from Plaintiff's Amended Complaint. <u>Docket Nos. 18, 35</u>.

#### i.   Plaintiff's 2005 Civil Rights Lawsuit

On September 2, 2005, Defendant UC 2570 was the ghost undercover agent (an undercover agent is responsible for providing security for the primary undercover agent) during a controlled narcotics buy wherein Plaintiff and others allegedly sold cocaine to the primary undercover agent. <u>Docket No. 33</u> ¶ 8. Plaintiff was arrested by officers who were members of the Brooklyn North Narcotics District ("BNND"), but the charges against him were later dismissed. <u>Id.</u>

Later in 2005, Plaintiff filed a civil rights lawsuit relating to the incident and reached a settlement with the City of New York. <u>Id.</u> ¶ 11. On January 6, 2006, the City of New York issued a check paying the settlement amount. <u>Id.</u> Although Plaintiff's 2005 civil rights lawsuit did not name any of Defendants in this action, it did name John Doe Defendants who, had the

lawsuit not settled, may have been identified as one or more Defendants in this action, for example, Defendant UC 2570.  Id.  Plaintiff alleges that as a result of the foregoing, Plaintiff was known to Defendant UC 2570 prior to the incident that is the subject of the instant action.  Id. ¶ 31.

Although Defendant Cooke was not present for Plaintiff's September 2005 arrest, according to Defendant Cooke, a sergeant asked him to complete some paperwork relating to Plaintiff's September 2005 arrest for processing and tracking.  Id. ¶¶ 28, 31.  Thus, Plaintiff was known to Defendant Cooke prior to the subject arrest as well.

### ii.  Operation Lightning Strikes Twice And Defendant UC 2570's Buy Reports

In or around October 2005, police began an eighteen-month investigation called Operation Lightning Strikes Twice.  Id. ¶ 12.  Over the course of Operation Lightning Strikes Twice, police officers made controlled narcotics buys from the Cypress Hills Housing complex and surrounding areas in Queens.  Id. ¶ 12.

Defendant UC 2570 worked as an undercover agent in connection with several controlled buys over the course of Operation Lightning Strikes Twice.  Id. ¶ 13.  As a result, Defendant UC 2570 would see the faces of individuals from whom he purchased narcotics.  Id. ¶¶ 13-14.  For each controlled buy, Defendant UC 2570 would fill out a buy report containing information pertaining to the buy.  Id. ¶¶ 13-14.  Among the recorded information was a John Doe ("JD") nickname for the buyer, whose physical description Defendant UC 2570 would record from memory on the buy report sometime after the buy.  Id. ¶ 14.

According to Plaintiff, the NYPD gave Defendant UC 2570 an incentive to conduct and report as many undercover buys as possible, as the NYPD had a policy of promoting undercover investigators based on the volume of buys and arrests they helped make in connection with

Operation Lightning Strikes Twice.  Id. ¶¶ 4, 11, 25.

### iii.   Defendant UC 2570's January 25, 2006 Buy Report

On January 25, 2006, Defendant UC 2570 purchased narcotics at 305 Fountain Avenue, Brooklyn, NY 11208 from a person Defendant UC 2570 called "JD Hood," so named because the person was wearing a hood at the time of the transaction.  Id. ¶ 15.  Apartment 7A belonged to another individual named "JD Brown Jacket," or Larry Bozeman, who was a frequent target of Operation Lightning Strikes Twice.  Id.

According to Defendant UC 2570, on January 25, 2006, he met Mr. Bozeman outside Apartment 7A, where they had a brief drug-related conversation before entering.  Id. ¶ 16.  Once inside, Mr. Bozeman introduced Defendant UC 2570 to JD Hood, who was sitting on the living room couch and who sold Defendant UC 2570 crack cocaine in exchange for money.  Id. According to Defendant UC 2570, the transaction took between ten and fifteen minutes.  Id. ¶ 17. Defendant UC 2570's buy was completed with the assistance of a backup team that included some individual police officers who had played some role in Plaintiff's September 2, 2005 arrest, all of whom Detective Cooke knew as friends or colleagues.  Id. ¶¶ 21, 27.

The physical description that Defendant UC 2570 wrote down for JD Hood in the related buy report was that he was a black male, 20-25 years old, approximately five-foot-eight to five-foot-eleven, approximately 190 pounds.  Id. ¶ 18.  On January 25, 2006, and despite the fact that he had been a part of Plaintiff's September 2, 2005 arrest, Defendant UC 2570 did not recognize JD Hood as Plaintiff.  Defendant Cooke, who was a member of the January 25, 2006 field team backing up Defendant UC 2570 did not recognize JD Hood as Plaintiff, either.  Id. ¶¶ 26-28.

Defendants did not arrest JD Hood on January 25, 2006, because the controlled buy was part of the ongoing Operation Lightning Strikes Twice.  Id.

**iv.  Defendant UC 2570's November 30, 2006 Encounter With JD Hood, Defendant Cooke's Recognition Of JD Hood As Plaintiff And Defendant UC 2570's December 5, 2006 Photo Array Identification Of Plaintiff As JD Hood**

Between January 25, 2006 and November 30, 2006, Plaintiff alleges that Defendant Cooke did very little to locate, investigate or identify JD Hood.  Id. ¶ 28.  On November 30, 2006, Defendant UC 2570 was walking with Mr. Bozeman in a courtyard between the buildings of a housing project when they ran into JD Hood and had a brief drug-related conversation with him.  Id. ¶¶ 23, 31.

At the time of Defendant UC 2570's and JD Hood's encounter, Defendant Cooke was sitting in the back seat of a police vehicle one block away.  Id. ¶¶ 28-31.  Defendant Cooke testified that when he saw Defendant UC 2570 and JD Hood together, which Defendant Cooke claimed was on a street corner, he recognized JD Hood as Plaintiff, remembering Plaintiff from the September 2, 2005 arrest paperwork that he had completed at a sergeant's request and from other encounters with Plaintiff within the precinct.  Id. ¶ 28.  According to Defendant Cooke, he was able to recognize JD Hood as Plaintiff without the aid of binoculars, despite being one block away.  Id. ¶¶ 28-31.

Plaintiff argues that Defendant UC 2570's and Defendant Cooke's versions of events are contradictory and that Defendant Cooke's version of events is not credible due to the physical circumstances under which he claims to have recognized Plaintiff as JD Hood.

After Detective Cooke's claimed November 30, 2006 identification of JD Hood as Plaintiff, on December 5, 2006, Defendant Cooke placed Plaintiff's photograph—which had been taken in connection with the 2005 arrest for which he brought a civil rights action and which Plaintiff contends should have been destroyed after the 2005 charges against him were dismissed—into a photo array and placed it before Defendant UC 2570.  Id. ¶ 33.  According to

Plaintiff's Amended Complaint, Defendant UC 2570 identified Plaintiff as JD Hood, the person

from whom Defendant UC 2570 had purchased drugs on January 25, 2006.  <u>Docket No. 18</u> ¶ 33.

### v. Defendant Cooke's February 25, 2007 Detention Of Plaintiff And The Related DD5 Report

On February 25, 2007, Defendant Cooke was driving with other officers when he saw

Plaintiff and stopped him.  <u>Docket No. 33</u> ¶¶ 36-38.  In the DD5 for the stop, Defendant Cooke

stated that he stopped JD Bear (not JD Hood).  <u>Id.</u> ¶ 36.  Defendant Cooke also wrote that the

individual identified himself to officers as Abdul Evans and that, when Defendant Cooke ran

Abdul Evans's information in a NYPD database, he saw that Abdul Evans's NYSID number was

the same as Plaintiff's NYSID.  <u>Id.</u>  Plaintiff denies telling Defendant Cooke that his name was

Abdul Evans and, according to Plaintiff, Defendant Cooke's claim in this regard is perplexing

because a later version of Plaintiff's RAP sheet does not show Plaintiff to have an Abdul Evans

alias.  <u>Id.</u> ¶ 37.  Plaintiff also notes that Defendant Cooke's DD5 describes Plaintiff as being fifty

pounds heavier than JD Hood as described by Defendant UC 2570 in his January 25, 2006 buy

report over one year earlier.  <u>Id.</u> ¶ 39.

### vi. Plaintiff's April 25, 2007 Arrest And Prosecution For The Alleged January 25, 2006 Narcotics Sale On The Basis Of Defendant UC 2570's And Defendant Cooke's Statements, And For Drug Conspiracy On The Basis Of The IC's Statements

On the basis of Defendant UC 2570's and Defendant Cooke's statements regarding

Plaintiff being the JD Hood who had sold narcotics during the January 25, 2006 controlled buy,

on April 25, 2007, Plaintiff was stopped by the police as he was driving, and he was arrested.  <u>Id.</u>

¶ 40.  For the January 25, 2006 incident, Plaintiff was charged with a single count of Criminal

Sale of a Controlled Substance in the Third Degree.  <u>Id.</u> ¶ 42.  In addition, Plaintiff was charged

with Conspiracy in the First Degree for narcotics distribution spanning October 2005 through

April 2007.  Id. ¶ 43.  Defendants claim that Plaintiff's January 25, 2006 drug sale connected him to the conspiracy and that a confidential informant informed them that Plaintiff had committed additional acts that connected him to the conspiracy as well.  Docket No. 35, Exh. N. Plaintiff was incarcerated for approximately eleven months before posting bail.  Docket No. 33 ¶ 44.

The case against Plaintiff continued in criminal court.  On April 10, 2012, ADA Rios successfully moved to dismiss the Conspiracy in the First Degree charge against Plaintiff because, according to ADA Rios, the CI had suffered a cognitive impairment and, without the CI, the People could not prove Plaintiff's guilt on the conspiracy charge beyond a reasonable doubt.  Id. ¶ 47.

On May 9, 2012, the date that trial was set to begin, ADA Rios moved to dismiss the single count of Criminal Sale of a Controlled Substance in the Third Degree as well.  Id. ¶ 49.

### b.  Procedural History

On June 15, 2012, Plaintiff brought this civil rights action against Defendants arising from his April 25, 2007 arrest and the ensuing prosecution.  Docket No. 1.  On June 3, 2013, Plaintiff filed his amended complaint, which stands as the operative pleading.  Docket No. 18.

Plaintiff filed this motion to compel Defendants to produce CI-related discovery, which Defendants opposed.  Docket Nos. 32, 35-36.  In support of their respective positions, the Parties filed memoranda of law, affidavits and supporting exhibits.  Docket Nos. 33-36.  I heard oral argument relating to the motion.  Docket No. 39.  I asked Defendants to make an in camera submission explaining in greater detail the CI's "cognitive impairment," which Defendants submitted.[1]

---

[1] In assessing Plaintiff's motion to compel, I have relied upon the content of this in camera

### c.   The CI Information Sought By Plaintiff

In sum and substance, Plaintiff's motion argues that, in order to prove his case, he needs and is entitled to CI information, which he describes as: (1) the substance of any statements the CI provided to law enforcement, <u>e.g.</u>, the nature and quality of Plaintiff's relationship with the CI, the specific evidence provided by the CI to law enforcement, whether the CI knew Plaintiff's name or a purported alias, etc.; (2) the dates on which the CI provided any information about Plaintiff and how the CI came to provide such information; (3) whether the CI was in custody facing charges when he or she provided information about Plaintiff; (4) what monetary or legal consideration the CI received as a result of providing information to law enforcement, if any; (5) grand jury minutes of the CI as they relate to Plaintiff; (6) law-enforcement documents memorializing the CI's statements about Plaintiff and the CI's basis for knowledge; (7) all other <u>Rosario</u> material regarding the CI relating to Plaintiff; (8) information relating to how and when the CI became "cognitively impaired," and the nature of the impairment; (9) whether the CI was a registered confidential informant and, if so, which officer registered the CI; and (10) when the CI had last provided useful information to law enforcement prior to providing information about Plaintiff.  <u>Docket No. 32</u>.

Defendants have submitted an affidavit from Assistant District Attorney Maria Linares ("ADA Linares"), who has worked approximately nineteen years for the Kings County District Attorney's Office, at times on narcotics investigations involving confidential informants.  <u>Docket</u>

---

submission when relevant.  During oral argument, Defendants and Plaintiff both stated that they had no objection to my use of the <u>in camera</u> submission in deciding the motion to compel even though Plaintiff has not had the opportunity to see it due to Defendant's assertion that it is protected by the law-enforcement privilege.  <u>Docket No. 39</u> at 71:20-73:3.

No. 35, Exh. N.  In that affidavit, ADA Linares states that it is her opinion that all of the CI

information sought by Plaintiff should be maintained confidential due to the risk that its

disclosure would reveal the CI's identity, which in turn would jeopardize the CI's safety and also

have a chilling effect on the willingness of others to serve as confidential informants.  Id.

 In the event the Court is not inclined to order Defendants' production of the CI

information without restriction, Plaintiff requests in the alternative that the Court conduct an in

camera review of all of the requested materials and testimony, and to thereafter limit disclosure

of the materials and testimony either to Plaintiff and his attorney or to Plaintiff's attorney alone.[2]

---

[2] Neither side briefed what the consequences of the nonproduction of the CI information would be on summary judgment or at trial.  As it is Plaintiff's burden to show Defendants' lack of probable cause for the initiation or continuation of the prosecution, Defendants' invocation of the law-enforcement privilege may undermine Plaintiff's attempt to show that Defendants lacked probable cause to initiate or continue the drug conspiracy prosecution against him.  See Savino v. City of N.Y., 331 F.3d 63, 72 (2d Cir. 2003).  An analogous dilemma arises in contexts in which a party invokes privilege yet intends to make the privileged information part of the defense.  For example, in Laxalt v. McClatchy, 116 F.R.D. 438, 452 (D. Nev. 1987), the court held that the defendants were within their rights to invoke the reporter's privilege in response to a defamation claim, but cautioned that

> [t]his is not to say, however, that all is bitter for the plaintiff.  For if the defendants are allowed to invoke the . . . reporter's privilege regarding their confidential sources, they must do so absolutely. . . . [I]f [the reporter] is questioned at trial regarding the sources for his articles, he may not respond that the information came from a 'reliable or confidential source.'  Instead, if [the reporter] chooses to rely on the privilege at trial, he must do so absolutely.  His response to such a question would therefore have to be that he relies on his privilege as a reporter under [state] law, and that he refuses to answer the question on that basis.  If the defendants were allowed to base their defense in this case, as they have done, on the reliability of their sources, and yet still be allowed to refuse to disclose what those sources are, the jury would be left without the crucial information it requires to make its decision.  The defendants could then give whatever information was favorable to their position, and refuse to disclose any detrimental facts.  This result would be unjust, as it would allow the defendants to have their cake and eat it, too.  Therefore, if the defendants choose to

Docket No. 32.[3]

## II. Legal Analysis

### a. The CI Information Is Relevant To Plaintiff's Malicious Prosecution Claim

Defendants argue that the information sought by Plaintiff is not relevant to his malicious

prosecution claim.  Docket No. 36.  I disagree.

"The party seeking discovery must make a prima facie showing that the discovery sought

is more than merely a fishing expedition."  Annunziato v. Collecto, Inc., 296 F.R.D. 112, 120

---

rely upon the privilege at trial, they may do so, but they must do so
absolutely[.]

Id. at 452-53 (citations omitted); see Mazzella v. Phila. Newspapers, Inc., 479 F. Supp. 523, 529
n.3 (E.D.N.Y. 1979) (holding that an order permitting the defendants to invoke the reporter's
privilege but adding that "[w]hile this decision imposes upon [the] plaintiffs a not insignificant
burden of making out a prima facie case of libel independent of evidence obtained through the
mouths of [the] defendants' confidential sources, discovery of these sources during trial if [the]
defendants choose to call them should adequately protect [the] plaintiffs' interest in having a full
opportunity to test the merits of the defense case . . . [and t]his opportunity or limitation of [the]
defendants' proof upon their . . . assertion of privilege is a reasonable accommodation of the
competing interests").

Here, it may be that the trial judge determines that it would be unfair for Defendants to "release[]
information, otherwise privileged, that is favorable to [their] position in the lawsuit while
withholding [from Plaintiff] privileged information that is adverse to [Defendants'] position
(using the privilege and 'a sword and a shield') or when it asserts a position that implicitly puts
into issue the substance of privileged information, absent which the claim or assertion cannot
properly be assessed."  Obeid v. La Mack, No. 14 Civ. 6498 (LTS) (MHD), 2015 WL 5581577,
at *10 (S.D.N.Y. Sept. 16, 2015) (quotations & citations omitted); see Chevron Corp. v.
Donziger, No. 11 Civ. 0691 (LAK) (JCF), 2013 WL 4045326, at *4 (S.D.N.Y. Aug. 9, 2013)
(noting that the "sword-shield doctrine . . . prohibits a litigant from using the work product
doctrine as a sword and a shield by selectively using privileged documents to prove a point but
then invoking privilege to prevent an opponent from challenging the assertion") (quotations &
citations omitted).  This and similar summary judgment or trial issues are not resolved herein but
rather are reserved for future motion practice to the extent the Parties wish to raise them.

[3] Plaintiff's motion also seeks an order compelling Defendants to produce the photograph of
Plaintiff that they included in the December 5, 2006 photo array from which the UC identified
Plaintiff as JD Hood.  Docket No. 32.  Defendants produced the photograph in their response and
this aspect of Plaintiff's motion is moot.  Docket No. 35 ¶ 4, Exh. C.

(E.D.N.Y. 2013); see Surles v. Air France, 210 F. Supp. 2d 501, 503 (S.D.N.Y. 2002). "Parties

may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or

defense[.]" Fed. R. Civ. P. 26(b)(1). "Relevant information need not be admissible at the trial if

the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Id.

Relevance "has been construed broadly to encompass any matter that bears on, or that reasonably

could lead to other matter that could bear on, any issue that is or may be in the case."

Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978). According to the Court of

Appeals, "[t]his obviously broad rule is liberally construed." Daval Steel Prods. v. M/V

Fakredine, 951 F.2d 1357, 1367 (2d Cir. 1991); see Condit v. Dunne, 225 F.R.D. 100, 105

(S.D.N.Y. 2004) ("Although not unlimited, relevance, for purposes of discovery, is an extremely

broad concept.").

        The requested CI information in this action corresponds primarily to Plaintiff's malicious

prosecution claim relating to the drug-conspiracy charge. In order to make a claim for malicious

prosecution, a plaintiff must show: (1) the initiation or continuation of a criminal proceeding

against him; (2) termination of the proceeding in his favor; (3) lack of probable cause for

commencing the proceeding; and (4) actual malice as a motivation for the defendant's actions.

See Kinzer v. Jackson, 316 F.3d 139, 143 (2d Cir. 2003) (citations omitted); see also Droz v.

McCadden, 580 F.3d 106, 109 (2d Cir. 2009); Powell v. Murphy, 972 F. Supp. 2d 335, 342

(E.D.N.Y. 2013). An "indictment by a grand jury creates a presumption of probable cause that

may only be rebutted by evidence that the indictment was procured by fraud, perjury, the

suppression of evidence or other police conduct undertaken in bad faith." Savino v. City of

N.Y., 331 F.3d 63, 72 (2d Cir. 2003). The existence of probable cause is a complete defense to a

malicious prosecution claim. Id. "Even where [the] plaintiff alleges . . . that the malicious

prosecution is based on fabricated evidence, the existence of probable cause independent of the fabricated evidence is a defense to that claim." Hoyos v. City of N.Y., 999 F. Supp. 2d 375, 390 (E.D.N.Y. 2013).

Here, Defendants argue that, pursuant to Hoyos, even if a fact finder determines that Plaintiff was not involved directly in a drug sale, the record demonstrates that law enforcement nonetheless had probable cause to believe that Plaintiff was involved in the drug conspiracy[4] because thirty-six other individuals were charged with Plaintiff for drug conspiracy and any of their acts are attributable to Plaintiff for the purposes of probable cause. Docket No. 36. Defendants' argument is incomplete. Insofar as Defendants claim that it is Plaintiff's direct involvement in a drug buy that "raises a strong inference of an illicit agreement"—agreement being another element of drug conspiracy—Defendants do not explain how other Defendants' acts in which Plaintiff took no part could be attributed to Plaintiff as a co-conspirator if a fact finder determines that Plaintiff's direct involvement in a drug sale can no longer be the basis for probable cause.

Plaintiff's theory is that the CI information is relevant because it will help him prove that the conspiracy charges were "orchestrated by [D]efendants[.]" Docket No. 34. For example, according to Plaintiff, Defendant Cooke falsely testified when he stated that, on November 30, 2006, he recognized JD Hood as Plaintiff. Docket No. 33 ¶¶ 28-34. Plaintiff argues that Defendant Cooke's claimed identification would have been impossible because, at the time, Defendant Cooke was by his own admission without binoculars and sitting in the back seat of a

---

[4] The elements of criminal conspiracy in New York are "an agreement to commit a crime and an overt act towards carrying out that agreement." People v. Nicholas, 118 A.D.3d 1183, 1184 (N.Y.A.D. 3d Dep't 2014); see People v. Caban, 5 N.Y.3d 143, 149 (2005) ("A conspiracy consists of an agreement to commit an underlying substantive crime . . . , coupled with an overt act committed by one of the conspirators in furtherance of the conspiracy.").

police vehicle one block away.  Id.  In addition, Plaintiff points out that Defendant Cooke and

Defendant UC 2570 gave inconsistent testimony about where Defendant UC 2570's conversation

with JD Hood took place.  Id.  Finally, Plaintiff argues that Defendant UC 2570's December 6,

2006 identification of Plaintiff as the perpetrator of the January 25, 2006 drug buy is dubious

because Plaintiff weighs approximately fifty pounds more than JD Hood as described in

Defendant UC 2570's January 25, 2006 buy report.  Docket No. 33 ¶¶ 32-35.

       Given Plaintiff's argument that the record contains evidence from which a reasonable

jury might find that Defendants in this case fabricated evidence, the CI information is relevant to

his claim because it is only by comparing the actual CI information against what Defendants

claim the CI said that Plaintiff can learn whether Defendants intentionally misrepresented the CI

information in order to falsely arrest and maliciously prosecution Plaintiff for crimes in which he

was not involved.  Plaintiff also argues that the CI information will show that Defendants either

directly told the CI to make particular false statements or coerced him to do so through other

means.

       In light of the foregoing, I find the CI information relevant to Plaintiff's malicious

prosecution claim relating to the conspiracy charge.

### b.   Legal Standards Relating To The Law-Enforcement Privilege

#### i.   The Party Asserting The Law-Enforcement Privilege Bears The Burden Of Showing That It Applies To The Contested Documents

       The law-enforcement privilege (or the informer's privilege) permits the government "to

withhold from disclosure the identity of persons who furnish information of violations of law to

officers charges with enforcement of that law."  Roviaro v. U.S., 353 U.S. 53, 59 (1957).  The

Second Circuit has stated that the law-enforcement privilege's purpose is

         [t]o prevent disclosure of law-enforcement techniques and

> procedures, to preserve the confidentiality of sources, to protect
> witness and law-enforcement personnel, to safeguard the privacy
> of individuals involved in an investigation, and otherwise to
> prevent interference with an investigation.

In re City of N.Y., 607 F.3d 923, 941 (2d Cir. 2010).

In In re City of New York, 607 F.3d 923, 940 (2d Cir. 2010), the Second Circuit

considered the scope of the qualified law-enforcement privilege for the first time in "over twenty

years" and stated that a court's initial inquiry in this area is to "determine if the law-enforcement

privilege applies to the documents at issue." Id. at 944. "[T]he party asserting the law-

enforcement privilege bears the burden of showing that the privilege applies to the documents in

question." Id.; see MacNamara v. City of N.Y., 249 F.R.D. 70, 78-79 (S.D.N.Y. 2008) ("In

order to assert a claim of privilege against disclosure of police materials to a plaintiff raising

federal civil rights claims . . . , the officers or the police department must do more than alert the

court to the [relevant privilege] or the generalized policies which support it.  The police must

make a substantial threshold showing[] that there are specific harms likely to accrue from

disclosure of specific materials . . . .").  "If such a showing is not made, the question is resolved

in favor of direct disclosure."  King v. Conde, 121 F.R.D. 180, 190 (E.D.N.Y. 1988).

> ### ii.  The Law-Enforcement Privilege Is A Qualified Privilege, And A Party Seeking Disclosure May Rebut The Strong Presumption Against Disclosure By Showing A Compelling Need For The Information Which Outweighs The Public's Interest In Nondisclosure

Once the proponent of the law-enforcement privilege has established its applicability to

the documents that are the subject of a discovery dispute, the matter is not necessarily settled.

That is because the law-enforcement privilege is a qualified privilege. See Roviaro, 353 U.S. at

60.  A party seeking disclosure may still, upon a proper showing, rebut a presumption against

lifting the privilege, although it should be said that the presumption against lifting the privilege is

"pretty strong." In re City of N.Y., 607 F.3d at 945 (quotations & citations omitted).

The first step of any party's effort to rebut the strong presumption against lifting the privilege is to show that that party has a compelling need for the information. The party must show

> (1) that [the litigant's] suit is non-frivolous and brought in good faith, (2) that the information sought is not available through other discovery or from other sources, and (3) that the information sought is important to the [litigant's] case. With respect to the importance of the information sought, [the Second Circuit held] that a "compelling need" is required.

Id. (quotations & citations omitted); White v. City of N.Y., No. 09 Civ. 9901 (BSJ) (THK), 2010 WL 2899665, at *1 (S.D.N.Y. July 23, 2010) (citations omitted), adopted by No. 09 Civ. 9901 (BSJ) (THK), Docket No. 26; see Holmes v. Fischer, No. 09 Civ. 929S (LGF), 2013 WL 1309157, at *5 (W.D.N.Y. Mar. 28, 2013); Carbajal v. Vill. of Hempstead, No. 02 Civ. 4270 (ADS) (ETB), 2003 WL 23138447, at *5 (E.D.N.Y. Dec. 22, 2003). "Disclosure is most appropriate when the informant is a key witness or participant or when the informant is integral to the case." Ayala v. City of N.Y., No. 04 Civ. 1102 (DC), 2004 WL 2914085, at *1 (S.D.N.Y. Dec. 16, 2004) (citing U.S. v. Saa, 859 F.2d 1067, 1073 (2d Cir. 1988)). "It is not enough that identification might be of some assistance, and disclosure should not be allowed simply to permit a fishing expedition or to gratify the moving party's curiosity or vengeance." White, 2010 WL 2800665, at *3-4.

In the event that the party seeking disclosure convinces a court that he or she has satisfied the three aforementioned factors, the second step to rebutting the privilege requires the court to balance "[t]he public interest in nondisclosure . . . against the need of a particular litigant for access to the privileged information." In re City of N.Y., 607 F.3d at 945. "In other words, demonstrating a 'compelling need' does not automatically entitle a litigant to privileged

information.  Rather, disclosure is required only if that compelling need outweighs the public

interest in nondisclosure."  Id.; see Roviaro, 353 U.S. at 60 (stating that "[t]he scope of the

privilege is limited by its underlying purpose" and offering as an examples of this principle a

situation in which "the disclosure of the contents of a communication will not tend to reveal the

identity of an informer" or a situation in which "the identity of the informer has [already] been

disclosed to those who would have cause to resent the communication").

### c.  Defendants Have Shown That The Law-Enforcement Privilege Applies To Certain Categories Of Requested CI Information, But Not To Others

Defendants argue that the law-enforcement privilege applies to the CI information in this

case because disclosure of the information would reveal the CI's identity.  Docket No. 36 (citing

Roviaro, 353 U.S. at 53).  According to Defendants, disclosing the requested CI information

would reveal the CI's identity and activities, would endanger the CI, and would have a chilling

effect on the willingness of others to work as confidential informants.  Docket No. 36 (citing In

re City of N.Y., 607 F.3d at 944).

Plaintiff counters that Defendants fail to make a threshold showing that the law-

enforcement privilege applies to any of the CI information because, according to Plaintiff,

Defendants merely speculate that CI information's release would undermine the CI's

confidentiality and endanger his or her life.  Docket No. 34.

Defendants have met the required threshold showing with respect to how the CI

information's disclosure would endanger the CI with respect to some, but not all, categories of

the requested CI information.  ADA Linares, who has worked on narcotics investigations

involving the use of confidential informants over the course of her approximately nineteen years

working for the NYPD, stated in an affidavit that it has been her experience that the disclosure of

the type of requested confidential informant information such that it may come to the attention of

those who have been prosecuted as a result of the confidential informant's assistance to the police or others who may be prosecuted in the future would create an incentive for some to harm or to retaliate against the confidential informant.[5] Docket No. 35, Exh. N. In addition to the disclosure of the requested confidential informant information jeopardizing the safety of the subject confidential informant, ADA Linares also explained that the disclosure would have a chilling effect on the willingness of others to act as confidential informants. Docket No. 35, Exh. N. As to the CI, Defendants' submission shows that for eighteen months from October 2005 to April 2007, law enforcement conducted Operation Lightning Strikes Twice in the Cypress Hills Housing complex and surrounding areas in Queens. Docket No. 33, ¶ 12; Docket No. 35, Exhs. H, N. During that extended investigation, police made use of various undercover officers and confidential informants. Id. The CI in this action provided information to police about Plaintiff as well as about other individuals. Id. As a result of Operation Lightning Strike Twice, law enforcement obtained an indictment charging Plaintiff with drug conspiracy along with thirty-six other defendants. Id.

In light of the foregoing, Defendants have shown that most of the requested CI information would compromise the CI's safety and the continuing availability of confidential-informant-based investigations, both of which are important public interests that the law-enforcement privilege is meant to protect. See In re City of N.Y., 607 F.3d at 941. I find that the law-enforcement privilege applies to the first (substance of any CI statements), second (the dates of any CI statements), third (whether or not the CI was in custody facing charges at the time he or she provided information about Plaintiff), fifth (grand jury minutes of the CI), sixth (law-

---

[5] I note that the CI's cognitive impairment, as shown to me by Defendants in their ex parte submission, renders him or her ill-equipped to adequately comprehend or deal with this danger.

enforcement records memorializing the CI's statements) and seventh (all CI Rosario materials)

categories of CI information because their revelation would tend to reveal the CI's identity,

leaving him or her vulnerable to reprisal from individuals who were investigated, indicted,

prosecuted or convicted as a result of the CI's work.

      Next, I find that the law-enforcement privilege partially applies to the fourth category of

CI information dealing with the CI's compensation but only insofar as it asks for details about

the nature of the legal consideration the CI received from law enforcement.  During oral

argument, Plaintiff's counsel told the Court that Defendants disclosed to Plaintiff that the CI

"receive[d] monetary compensation and also consideration in a criminal matter." Docket No. 39

at 3:20-25.  Details about the CI's receipt of legal consideration by its nature tends to reveal

identifying information about the CI because it may allow someone to deduce the nature of the

criminal matter in which the CI was involved, which in turn may permit recognition of his or her

identity.

      Finally, I find that the law-enforcement privilege applies to the eighth category of CI

information, which asks how the CI became "cognitively impaired."  Defendants have submitted

information about the CI's "cognitive impairment" for in camera review.  After reviewing the

material I find that the nature of this information is such that its release would threaten to expose

the CI's identity.  Going forward, I will refer to the first, second, third, fourth (as it pertains to

the details about the legal consideration the CI received in a criminal matter), fifth, sixth, seventh

and eight categories of the requested CI information collectively as the "privileged CI

information."

      Plaintiff argues that Adams v. City of N.Y., 993 F. Supp. 2d 306, 316-17 (E.D.N.Y.

2014), requires that Defendants must make a more specific showing of the law-enforcement

privilege's applicability to the privileged CI information than what appears in ADA Linares's affidavit.  Docket No. 34.  I disagree because a combination of the underlying facts in this case and ADA Linares's affidavit about the privileged CI information's sensitivity leads me to the conclusion that disclosure of the privileged CI information would endanger the CI's personal safety.[6]  In contrast, the issue in Adams was not so clear on its face, which demonstrates that the amount of explanation a defendant is required to provide in order to substantiate a claim of law-enforcement privilege depends on the facts of the case.  In Adams, the Section 1983 plaintiff was a grand juror who sued an undercover officer and others after the officer claimed that the grand juror had threatened him in the jury room, resulting in the juror's arrest and prosecution.  See Adams, 993 F. Supp. 2d at 311-12.  The Adams Court denied the defendants' in limine motion asking permission for the defendant undercover officer to testify at trial out of public view via closed-circuit television, explaining that the defendants' argument impermissibly rested upon speculation that the defendant undercover officer's personal safety and police investigations would be compromised if he appeared to testify in open court.  Id. at 313-14.  According to Adams, the defendants failed to "offer[] concrete details as to how testifying in a civil trial" could cause that harm to the defendant undercover officer.  Id.  Thus, in Adams, the defendants

---

[6] Plaintiff also relies on Miller v. Mehltretter, 478 F. Supp. 2d 415, 425 (W.D.N.Y. 2007).  In Miller, the court expressed confusion as to whether the law-enforcement privilege could apply to protect a law enforcement agent from testifying about the nature and dates of his contacts with the city corporation counsel and other non-law-enforcement city employees, concluding that the government did not meet its burden to show that the law-enforcement privilege applied because it did "not explain why disclosure of contacts with [c]ity officials (and not local law enforcement) would implicate the law enforcement privilege."  Id. (emphasis in original). "Instead, [the government] makes only vague and conclusory statements without any specific or particularized facts to support [its] claim that the testimony about contacts with City employees . . . would be privileged."  Id. (citation omitted).  Here, unlike in Miller, the CI provided information to police in connection with Operation Lightning Strikes Twice, which Plaintiff does not contest was a law-enforcement operation.

had not made clear to the Court why the public testimony of an undercover officer who allegedly

threatened a grand juror would endanger that officer's personal safety or compromise police

investigations in an unrelated context.  In contrast, here, disclosure of the privileged CI

information in the context of this case, which deals with a narcotics investigation resulting in

many successful convictions, Docket No. 35, Exh. G (referring to an indictment charging thirty-

seven individuals with drug conspiracy and subsequent convictions), is likely to pose a threat to

the CI's safety due to the possibility that a person who was charged or convicted as a result of

the CI's collaboration with this police would seek retribution against the CI.[7]

On the other hand, I find that Plaintiff's Adams argument has merit with respect to

the three remaining categories of requested CI information.  First, I find that the law-enforcement

privilege does not apply to that part of the fourth category simply asking the amount of monetary

compensation that the CI received in exchange for the information that he or she provided to

police, particularly when Defendants have already disclosed the fact of the CI's receipt of

---

[7] I also reject Plaintiff's suggestion that Adams established a per se rule that the law-enforcement privilege may not, as a matter of law, apply to a CI's physical appearance.  Docket No. 34. Adams "[a]ssum[ed] that a testifying witness's physical appearance could be characterized as the kind of information that may be subject to the privilege" for the purposes of the rest of its analysis.  Adams, 993 F. Supp. 2d at 313.  Indeed, of all the requested CI information in this case, there are few other types of information that would reveal the CI's identity more readily than his or her physical appearance.

Lastly, I reject Plaintiff's argument that because the CI is no longer active in law-enforcement activities and providing testimony, the CI information would not endanger his or her safety or undermine the ability of law enforcement to conduct future investigations.  Docket No. 34; see In re City of N.Y., 607 F.3d at 944-45; MacNamara, 249 F.R.D. at 79 (stating that "[a]n investigation need not be ongoing for the law enforcement privilege to apply"); Nat'l Congress for Puerto Rican Rights v. City of N.Y., 194 F.R.D. 88, 95 (S.D.N.Y. 2000) (observing that "the ability of a law enforcement agency to conduct future investigations may be seriously impaired if certain information is revealed"); cf. Rosser v. City of Phila., No. 5 Civ. 514 (JH), 2005 WL 2205920, at *2 (E.D.Pa. Sept. 9, 2005) (finding that the disclosure of a confidential informant's file was not likely to endanger or inconvenience her because she was no longer found at her last known address and was believed to have moved out of state).

monetary compensation.  Docket No. 39 at 3:20-25.  On this record, I do not conclude that that

dollar amount, without more, would tend to expose the CI's identity.[8]  Furthermore, facts

relating to monetary compensation is often entered in evidence in criminal and Section 1983

cases.[9]

     Second, I find that the law-enforcement privilege does not apply to the ninth category of

CI information asking whether the CI was a registered CI.  This information would not tend to

identify the CI, and ADA Linares does not separately address this question.  And again, this is a

fact which is often part of the record in criminal and Section 1983 cases.[10]

     Lastly, I find that the law-enforcement privilege does not apply to the tenth category of

---

[8] Defendants do not offer any facts and related argument specific to this category of CI information.

[9] See Cooper v. City of New Rochelle, 925 F. Supp. 2d 588, 607 (S.D.N.Y. 2013) (stating that the defendants were justified in relying on a confidential informant's tip because his veracity and reliability was shown in part by the fact that the government had used one of them more than ten times in the past and paid him); U.S. v. Warrick, No. 10 Crim. 352A (HKS), 2012 WL 5499627, at *1 (W.D.N.Y. Apr. 13, 2012) (restating an officer's argument that he believed a confidential informant who he had known for approximately three years to be reliable because, among other things, he or she was not being paid such that there was nothing to gain from providing the information); U.S. v. Hill, No. 10 Crim. 191A (HKS), 2012 WL 912948, at *9-10 (W.D.N.Y. Mar. 16, 2012) (denying the criminal defendant's motion to compel the government to tell him whether an informant was paid because the defendant did not tell the court how he felt the disclosure of the information would be of even marginal value to the defendant's case); U.S. v. Williams, 758 F. Supp. 2d 287, 302-03 (S.D.N.Y. 2010) (denying the defendant's motion that the judge's probable cause finding be reversed because, among other things, the supporting affidavit did not include the fact that the confidential informant was a paid informant because even though that fact "clearly" should have been in the affidavit, "disclosure that the CI was a paid informant would not undermine the central facts establishing the CI's reliability"), reversed & remanded on other grounds, 681 F.3d 35 (2d Cir. 2012).

[10] See Aboulissan v. City of N.Y., No. 88 Civ. 420 (CBA), 1991 WL 37067, at *4 (E.D.N.Y. Mar. 15, 1991) (discussing whether the defendants in a Section 1983 action had shown how the disclosure of particular material would threaten the identities of registered confidential informants); Delgado v. City of N.Y., 86 A.D.3d 502, 508 (N.Y.A.D. 1st Dep't 2011) (observing that the plaintiff's expert, a retired sergeant in the police force, testified that police procedure requires that CIs "may not be utilized before they are properly registered and approved").

CI information asking when the CI had last provided useful information to law enforcement prior to providing information about Plaintiff.  The question does not ask for a specific date on which the CI actually provided information to law enforcement about Plaintiff or a specific date on which the CI provided information in other investigations.  Instead, this discovery request simply asks a general question about how recently the CI had provided useful information to law enforcement prior to the CI's reports about Plaintiff.  On this record, due to the absence of any specific dates and due to the fact that Plaintiff does not seek any specific information about the nature of the prior investigation pursuant to which the CI offered useful information, I do not conclude that Defendants' disclosure of this expanse of time tends to reveal the CI's identity in whole or even in part.[11]  Docket No. 33 ¶ 43; see White, 2010 WL 2899665, at *4 (finding that the defendant had not demonstrated that information about "commonplace drug buys that occurred more than one year ago, would tend to disclose the identity" of the confidential informant and ordering the information's release to the plaintiff).

In light of the foregoing, I find that the law-enforcement privilege applies to the first, second, third, part of the fourth (but only with regard to details about the legal consideration the CI received in connection with his involvement in a criminal matter), fifth, sixth and seventh categories of CI information, but I find that the law-enforcement privilege does not apply to

---

[11] It should be noted that when Plaintiff's counsel asked ADA Rios during her deposition when was the last time that the CI had provided reliable information about another investigation, ADA Rios responded that she could not remember when, in response to CI information that was on its face more sensitive, ADA Rios stated that she could not disclose.  Docket No. 35, Ex. L at 73 ("I don't remember. . . . I don't know if I could find out when.").  ADA Rios then answered questions about how she might go about finding the answer to that question.  Id. (explaining that the CI's files were a set of records different from Plaintiff's case files).

Although ADA Rios's failure to respond to the question by stating that she could not disclose the information because it would tend to disclose the CI's identity is not dispositive on the question of whether the information is sensitive, I find that that this specific category of CI information is described by Plaintiff in such a way that it would not tend to identify the CI.

Plaintiff's request for information about how much monetary compensation the CI received for the information provided to law enforcement, whether the CI was a registered CI and when the CI had last provided useful information to law.  As a result, Defendants must produce the unprivileged information to Plaintiff within ten days of the publication of this Order.

### d.  Plaintiff Has Demonstrated A Compelling Need For The Privileged CI Information

Now that I have determined that the law-enforcement privilege applies to certain categories of the CI information, the burden shifts to Plaintiff to defeat the "strong presumption against lifting the privilege." In re City of N.Y., 607 F.3d at 945 (quotations & citations omitted); see White v. City of N.Y., No. 09 Civ. 9901 (BSJ) (THK), 2010 WL 2899665, at *1 (S.D.N.Y. July 23, 2010) (citations omitted); see Holmes v. Fischer, No. 09 Civ. 929S (LGF), 2013 WL 1309157, at *5 (W.D.N.Y. Mar. 28, 2013); Carbajal, 2003 WL 23138447, at *5.  The first step of Plaintiff's burden in this regard is to convince the Court that he has a compelling need for the privileged CI information.  I find that Plaintiff has shown that he has a compelling need for the privileged CI information vis-à-vis his malicious prosecution claim on the conspiracy charges.

First, Defendants concede the first element of the test for compelling need for the purposes of this motion, which is that Plaintiff's lawsuit is non-frivolous and brought in good faith.  Docket No. 36; In re City of N.Y., 607 F.3d at 945.  I agree.

As to the second element, Defendants argue that the privileged CI information is available through other discovery—in particular, Defendants argue that Plaintiff can find the privileged CI information by reading ADA Rios's and Defendant Cooke's deposition testimony. Docket No. 36; In re City of N.Y., 607 F.3d at 945.  I disagree.  Plaintiff's litigation theory is that Defendants fabricated evidence relating to what the CI told law enforcement about

23

Plaintiff's involvement in the conspiracy, or coerced the CI to fabricate such evidence.  As a result, Plaintiff has not obtained the privileged CI information through Defendant Cooke or ADA Rios.  Rather, these witnesses have testified about facts such as compensation provided to the CI, but they have not testified as to any direct coercion.  Docket No. 33, Exhs. B, C.  Additionally, according to Plaintiff, in his case, law enforcement have proven to be untrustworthy reporters of important information, so he should receive the information in an unfiltered way.  In contrast, the privileged CI information would offer something unique, the opportunity for Plaintiff to compare Defendants' account of what the CI told law enforcement against the original CI information.  See Moroughan v. Cty. of Suffolk, No. 12 Civ. 512 (JFB) (AKT), 2015 WL 2412365, at *4 (E.D.N.Y. May 20, 2015) (stating that "the information in the [witness] notes[, which was recorded contemporaneously with the shooting that was the subject of the lawsuit,] is not available from other sources when accounting for the timing of the notes as well as the investigator's taking down what he is hearing").  Accordingly, Plaintiff cannot obtain the privileged CI information that he seeks from other sources.

As for the third element, Defendants argue that the privileged CI information is not important to Plaintiff's claim because the CI was not present for the January 25, 2006 drug buy that connected Plaintiff to the larger conspiracy.  Docket No. 36.  I find Defendants' position without merit.  ADA Rios testified that, although probable cause for the conspiracy charges rested upon Plaintiff's January 25, 2006 drug sale, the CI had told law enforcement about other aspects to Plaintiff's involvement in the drug conspiracy that supplied probable cause as well.  Docket No. 33, Exh. C.  Thus, if Plaintiff convinces a fact-finder that Defendants fabricated evidence about his being JD Hood at the January 25, 2006 drug sale (which he hopes to achieve by arguing about Defendants' arguably incredible or contradictory statements), the credibility

and veracity of the CI's reports about Plaintiff's other involvement in drug buys becomes very important to Plaintiff's ability to meet his burden of proof that Defendants had no probable cause to initiate or continue the prosecution against Plaintiff for the conspiracy charge.

Defendants cite to Kirkland v. City of New York, No. 06 Civ. 0331 (NG) (CLP), 2007 WL 1541367, at *9-11 (E.D.N.Y. May 25, 2007), in support of their position that the CI information is not important to Plaintiff's case, but I find Kirkland to be inapposite.  In Kirkland, the court denied the plaintiff's motion to compel the disclosure of the confidential informant's identity because "[e]ven after some preliminary discovery, [the] plaintiff has not sufficiently alleged facts showing how the identity or testimony of the [confidential informant] might be used to test probable cause."  Id. at *11.  In contrast, here, Plaintiff argues that if he can convince a fact-finder that the January 25, 2006 drug buy does not provide probable cause for the initiation or continuation of the conspiracy charge, he can then use the CI information as an alternate basis for testing probable cause.  Docket Nos. 33, 34; cf. Edwards v. Schoenig, No. 05 Civ. 5427 (JS) (GRB), 2014 WL 4638935, at *3 (E.D.N.Y. Sept. 16, 2014) (stating that the plaintiff's "conclusory assertion that additional portions of the . . . policy are being hidden to cover up the fact that the [d]efendants' actions did not conform to specific policies is not enough to render this highly sensitive information accessible").

I also reject Defendants' argument that the CI information is not important to Plaintiff's case because a state criminal court judge reviewed the grand jury minutes relating to Plaintiff's indictment and found the evidence to be sufficient to support the charging document.  Docket No. 36.  Insofar as Plaintiff's theory is that Defendants fabricated evidence or coerced the CI to fabricate evidence, the state criminal court judge's reliance upon that allegedly fabricated evidence cannot have any definitive significance for the presence of probable cause for the

conspiracy charges at this time.  See Savino, 331 F.3d at 72 (stating that a grand jury's finding of probable cause may be rebutted "by evidence that [it] was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith").

In light of the foregoing, I find that Plaintiff has shown a compelling need for the privileged CI information because his case is brought in good faith, the privileged CI information cannot be obtained from other sources, and the privileged CI information is important to Plaintiff's claim.  Docket No. 36; In re City of N.Y., 607 F.3d at 945.

### e.  Plaintiff's Compelling Need For The Privileged CI Information Does Not Outweigh The Public's Interest In Nondisclosure

Having shown that he has a compelling need for the privileged CI information, in order for Plaintiff to defeat the "strong presumption against lifting the privilege," he must now show that his compelling need for the privileged CI information outweighs the public's interest in nondisclosure.  In re City of N.Y., 607 F.3d at 945 (quotations & citations omitted).  "By its very nature, this 'sensible balancing test' is multi-factored, non-mechanical, and circumstance-specific."  Floyd v. City of N.Y., 739 F. Supp. 2d 376, 381 (S.D.N.Y. 2010) (citing In re City of N.Y., 607 F.3d at 945).

"In balancing the interests favoring and disfavoring disclosure, the sensitivity of the information in question is a significant factor—the greater the sensitivity, the greater the protection, and vice versa."  Floyd, 739 F. Supp. 2d at 381.  There is no question that the privileged CI information in this case is highly sensitive.  Its disclosure would compromise the CI's confidentiality and safety.  This in turn would likely have a chilling effect upon the willingness of other individuals to aid in investigations and prosecutions as confidential informants going forward.  Docket No. 35, Exh. N; see In re City of N.Y., 607 F.3d 923, 941 (2d Cir. 2010); Dorsett v. Cty. of Nassau, 762 F. Supp. 3d 500, 522 (E.D.N.Y. 2011) ("Officials with

law enforcement responsibilities may be heavily reliant upon the voluntary cooperation of

persons who may want or need confidentiality.") (citation omitted).  As a result, the public's

interest in law enforcement maintaining the CI's confidentiality is strong.

Another important factor in balancing interests is "whether a lawsuit involves a matter of

public concern such as civil rights—a factor that will usually support disclosure."  Floyd v. City

of N.Y., 739 F. Supp. 2d 376, 381 (S.D.N.Y. 2010).  "The public has a profoundly important

interest 'in giving force to the federal civil rights law,' and in reasonable transparency from law-

enforcement agencies."  Id. at 382 (citing King v. Conde, 121 F.R.D. 180, 195 (1988)).  Thus,

there is no question that Plaintiff's interest in the privileged CI information is also of great

weight in this case; the privileged CI information is important to Plaintiff's allegation that

Defendants lacked probable cause for the drug conspiracy charge and there is the additional

troubling allegation that Plaintiff was targeted for malicious prosecution by police in retaliation

for Plaintiff's successful civil lawsuit challenging his September 2, 2005 arrest.  See, e.g.,

Docket No. 33 ¶ 11 (stating that the City paid Plaintiff a settlement in that action the same month

as the alleged January 25, 2006 drug buy); id. ¶ 21 (stating that five officers who played roles in

Plaintiff's September 2, 2005 arrest were among Defendant UC 2750's back-up team for the

January 25, 2006 buy).

Although Plaintiff's compelling need is strong in this case, I find that the public's interest

in nondisclosure outweighs it.  Courts in this Circuit have reached the same conclusion when

balancing the public's interest in nondisclosure of "highly sensitive" information against a

plaintiff's need for similar discovery in other civil rights lawsuits.  For example, the privileged

CI information at issue is "highly sensitive" in the same vein as the field reports in In re City of

N.Y., 607 F.3d 923, 941 (2d Cir. 2010).  See White, 2010 WL 2899665, at *3 (quashing a

subpoena in a civil rights lawsuit "so far as it seeks . . . any documents that would tend to reveal the identity of the CI"); cf. Moroughan, 2015 WL 2412365, at *4 (compelling the police to disclose notes from witness interviews relating to a shooting, finding that release of those records would not, among other things, "impair the ability of a law-enforcement agency to conduct future investigations"); see also Floyd, 739 F. Supp. 2d at 385 (stating that the IAB documents in that case were "a far cry" from the "highly sensitive" records in In re City of N.Y. because the information therein did "not involve secret operations or undercover officers").

Plaintiff's argument—that his compelling need for the privileged CI information should outweigh the public's interest in nondisclosure because the CI is no longer active and is cognitively impaired—does not carry the day. Docket No. 34. Plaintiff cites to Floyd v. City of N.Y., 739 F. Supp. 2d 376, 381 (S.D.N.Y. 2010), as support for this proposition, but Floyd is inapposite. In Floyd, the court held that the police officers had no privacy interest in their IAB files because "none of these officers are undercover obviating any concern about blowing a cover and jeopardizing the safety of an officer." Id. In contrast, here, the CI's confidentiality is intact, and there is serious concern about revealing his or her identity. The fact that the CI is no longer active is of no moment in terms of concern that his or her safety would not be at risk for past service to law enforcement. Operation Lightning Strikes Twice lasted approximately eighteen months and resulted in an indictment charging thirty-seven individuals with drug conspiracy. Docket No. 35, Exh. G. ADA Linares stated that the CI who provided information about Plaintiff also provided information about others participating in the conspiracy, many of whom have been convicted. As a result, regardless of the fact that the CI is no longer active, all those who have been prosecuted on the basis of information provided by the CI or others who may be prosecuted in the future could have an incentive to harm or retaliate against the CI in the event

28

that confidentiality were compromised.  See In re City of N.Y., 607 F.3d at 944-45; MacNamara, 249 F.R.D. at 79 (stating that "[a]n investigation need not be ongoing for the law-enforcement privilege to apply"); Nat'l Congress for Puerto Rican Rights v. City of N.Y., 194 F.R.D. 88, 95 (S.D.N.Y. 2000) (observing that "the ability of a law-enforcement agency to conduct future investigations may be seriously impaired if certain information is revealed"); cf. Rosser v. City of Phila., No. 5 Civ. 514 (JH), 2005 WL 2205920, at *2 (E.D.Pa. Sept. 9, 2005) (finding that the disclosure of a CI's file was not likely to endanger or inconvenience her because she was no longer found at her last known address and was believed to have moved out of state).

Plaintiff's argument that disclosure of the privileged CI information does not divulge "any secret law-enforcement techniques or procedures" because it does not "contain a road map or manual to narcotics investigations generally or [Operation] Lightning Strikes Twice specifically" is misplaced.  Docket No. 34.  Here, Defendants' have identified the relevant public interest in this case to be that disclosure of the CI information would jeopardize the safety of the CI and have a chilling effect upon other witnesses' willingness to serve as CIs in the future. Docket No. 35, Exh. N.  Given that the cognitive impairment was of sufficient magnitude that the ADA had to dismiss claims that relied on the CI's testimony, the Court understands the CI's wherewithal to be compromised.  In this case, the CI's safety is of particular concern to the Court because the CI's cognitive impairment makes it less likely that the CI could take actions to protect him- or herself, for example, by moving, by changing his or her telephone number, or taking other protective actions.

In the event that the Court was not inclined to order disclosure of the privileged CI information, Plaintiff requested that an in camera review of the documents be conducted.  Docket No. 34.  Because "the law-enforcement privilege is not an instrument by which law-enforcement

29

agencies may shield themselves from public scrutiny," under appropriate circumstances, a court

may "conduct an in camera inspection of the materials in question." Floyd, 739 F. Supp. 2d at

379; see In re City of N.Y., 607 F.3d at 948 (stating that a court "may, in the exercise of its

informed discretion and on the basis of the circumstances presented, require that the party

possessing the documents appear ex parte in chambers to submit the documents for in camera

review by the judge").  On this motion, apart from my review of the information about the CI's

"cognitive impairment" in camera, I find it unnecessary to review the balance of CI documents

for the reasons I stated above about the materials' sensitivity.

It should also be noted that my review of Defendants' in camera submission about the

CI's "cognitive impairment" did not reveal any information tending to support Plaintiff's

fabrication of evidence theory such that additional review of privileged CI information appeared

necessary on that basis alone.

Finally, Plaintiff suggests that if the Court is disinclined to order Defendants to disclose

the privileged CI information without restriction, then the Court should order Defendants to

disclose the privileged CI information to Plaintiff's counsel with an "Attorneys' Eyes Only"

designation.  Docket No. 34.  In In re City of New York, 60 F.3d at 936, the Second Circuit

rejected just such an argument, stating that

> [e]ven if the "attorneys' eyes only" procedure works in some
> commercial litigation, as well as some criminal cases . . . the
> consequences of accidental disclosure are too severe to employ the
> procedure [in the context of highly sensitive records deemed
> protected by the law-enforcement privilege.]

Cf. Stinson v. City of N.Y., No. 10 Civ. 4228 (RWS), 2014 WL 1243796, at *3-4 (S.D.N.Y.

Mar. 24, 2014) (ordering the "Attorneys' Eyes Only" release of recorded police precinct

meetings in which officers discussed crime statistics compiled by computer and stating that the

propriety of such an approach was fact specific).  I find that the privileged CI information in this

case is inappropriate for "Attorneys' Eyes Only" release because it is much more like the field

reports made by undercover officers at issue in In re City of New York in terms of its sensitivity

than it is like the precinct meeting recordings in Stinson.

### III. Conclusion

In light of the foregoing, I **grant in part** and **deny in part** Plaintiff's motion at [32] to

compel Defendants to disclose the CI information.  I **grant** Plaintiff's motion insofar as

Defendants must disclose the nonprivileged CI information, which I have above described as part

of the fourth (the amount of monetary compensation the CI received for provided information to

law enforcement in the context of Operation Lightning Strikes Twice, but no details as to the

nature of the legal consideration the CI received), ninth and tenth categories of requested CI

information, within ten days of the entry of this Order.  I **deny** Plaintiff's motion insofar as

Defendants need not disclose the privileged CI information because Plaintiff has failed to rebut

the strong presumption against disclosure raised by the law-enforcement privilege.


A Telephone Conference is set for September 30, 2015 at 4:30 PM to discuss other

discovery issues, motion practice, trial preparation schedule and settlement discussions.

Defendants must initiate the conference by calling Chambers at (718) 613-2300 with all Parties

on the line.


Dated:  Brooklyn, New York
            September 28, 2015

*Vera M. Scanlon*
VERA M. SCANLON
United States Magistrate Judge

31